THE OSCEOLA and THE HERCULES, and
nine other cases.

District Court, S. D. New York.   June 3,
1924.

1. **Collision** ⬠➡100(1)—**Tugs starting out with
tow in foggy weather, which became worse,
held matter of discretion, not negligence.**

Tugs starting out with tow under foggy
weather conditions, which became worse, *held* a
matter of discretion, not in itself negligence.

2. **Collision** ⬠➡105(6)—**Breaking of hawser
held cause of tow's collision with car float,
rather than vice versa.**

Evidence *held* to show that tow's collision
with car float lying at end of pier occurred
after breaking of hawser, rather than that
breaking of hawser was due to collision.

3. **Collision** ⬠➡22—**That collision of tow with
car float at end of pier was due to inevita-
ble accident held not established.**

Defense of inevitable accident, resulting in
collision of tow with car float lying at end of
pier, after hawser had parted, *held* not sus-
tained.

4. **Collision** ⬠➡22—**Defense of "inevitable ac-
cident" requires proof of cause thereof, that
defendant did not contribute to it, or could
not have prevented it, or, if cause is not
shown that defendant was not responsible
for any possible cause.**

To sustain defense of inevitable accident,
defendant must prove, if the cause of the ac-
cident is shown, that he did not by want of
care and skill contribute to it, or that he could
not have prevented it by the exercise of
much care and skill, and, if the cause is not
shown, he must show all possible causes, and
that he was not responsible for any of them.

[Ed. Note.—For other definitions, see Words
and Phrases, First and Second Series, Inevita-
ble Accident.]

In Admiralty.   Libel by John J. Coughlin
against the tugs Osceola and Hercules, with
nine other libels, tried together, but not con-
solidated.   Decrees in accordance with opin-
ion.

See, also, 18 F.(2d) 418.

Leo J. Curren, of New York City, for li-
belant Coughlin.

Macklin, Brown & Van Wyck and Horace
L. Cheyney, all of New York City, for libel-
ants Goldrick and others.

Alexander & Ash, of New York City (Pe-
ter Alexander, of New York City, of coun-
sel), for libelant Empire Brick & Supply Co.

Kirlin, Woolsey, Campbell, Hickox &
Keating, of New York City (Robert S. Er-
skine, of New York City, of counsel), for the
Osceola and the Hercules.

Bigham, Englar & Jones, of New York
City (Leonard J. Matteson, of New York
City, of counsel), for Director General of
Railroads.

WARD, Circuit Judge.   These ten cases,
though not consolidated, were tried together,
counsel agreeing that all the proofs should
apply to each case.   To reduce the confusion
as much as possible, I will classify the cases
with reference to the proctors of record,
pointing out also that the steamship Pathfind-
er, though impleaded by the Cornell Steam-
boat Company in all but two of the cases, was
never brought in by a citation, while the Di-
rector General of Railroads, though brought
in and appearing, filed answers in two of the
cases only:

(1) Leo J. Curren, Esq.—John J. Cough-
lin v. Tugs Osceola and Hercules; Steamship
Pathfinder and the Director General of Rail-
roads impleaded by the claimant, Cornell
Steamboat Company.   No answer by the Di-
rector General.

James McWilliams Blue Line v. Tugs Os-
ceola and Hercules; Steamship Pathfinder
and the Director General of Railroads im-
pleaded by the claimant, Cornell Steamboat
Company.   No answer by the Director Gener-
al.

(2) Messrs. Macklin, Brown & Van Wyck
and Horace L. Cheyney, Esq.—Philip Gold-
rick v. Tugs Osceola and Hercules; Steamship
Pathfinder and the Director General of Rail-
roads impleaded by the claimant, Cornell
Steamboat Company.   No answer by the Di-
rector General.

Brigham Bros. v. Tugs Osceola and Her-
cules; Steamship Pathfinder and the Direc-
tor General of Railroads impleaded by
claimant, Cornell Steamboat Company.   No
answer by the Director General.

Charles F. Schleede v. Tugs Osceola and
Hercules; Steamship Pathfinder and the Di-
rector General of Railroads impleaded by the
claimant, Cornell Steamboat Company.   No
answer by the Director General.

Williams Line, Inc., v. Tugs Osceola and
Hercules; Steamship Pathfinder and the Di-
rector General of Railroads impleaded by the
claimant, Cornell Steamboat Company.   An-
swer of the Director General to the petition
and interrogatories.

James A. McAllister v. Tugs Osceola and
Hercules; Steamship Pathfinder and the Di-
rector General of Railroads impleaded by the
claimant, Cornell Steamboat Company.   An-
swer of the Director General to the petition
and interrogatories.

(3) Messrs. Alexander & Ash and Peter
Alexander, Esq.—Empire Brick & Supply
Company v. Tugs Osceola and Hercules and
Director General of Railroads.   No answer
by the Director General.

(4) Messrs. Kirlin, Woolsey, Campbell,

Hickox & Keating and Robert S. Erskine, Esq., for the Tugs Osceola and Hercules; Cornell Steamboat Company, claimant.

James J. Dwyer et al. v. Director General of Railroads. No answer by the Director General.

Hudson River Blue Stone Company v. Director General of Railroads. No answer by the Director General.

Messrs. Bigham, Englar & Jones and Leonard J. Matteson, for the Director General of Railroads.

December 9, 1919, the tug Osceola with the Hercules as helper, bound down the Hudson river on an ebb tide with a tow of 27 loaded and 5 light boats, some 1,300 feet long, for the pier at the foot of Fifty-Fourth street known as the Market, where it was to be tied up and distributed, as customary, rounded to and tied up at the P. Sanford Ross wharf, just above Fort Lee, on the west side of the river, on account of thick fog.

On the morning of the 10th at about 1 a. m., the weather having cleared considerably, the tugs started out again on the next ebb tide for their destination, which was about five nautical miles lower down. Subsequently, the fog setting in denser than ever, the Osceola sent the Hercules ahead to signal when she had passed the naval anchorage on the east side of the river which extends to Seventy-Ninth street, so that the tow might be rounded to below that point clear of the war ships and be dropped down on the ebb tide to Fifty-Fourth street.

[1] The tugs are charged with negligence in starting out under the weather conditions, but this was a matter of discretion, and I think that the proofs make it clear that a reasonable discretion was exercised in doing so. That the fog subsequently arising was extraordinarily dense is proved by the differing accounts the witnesses give of the place where the tow rounded to, of its distance from the New York piers, and of various other circumstances about which they evidently cannot speak with any accuracy. The weight of the positive testimony is that the range of visibility was not over 100 feet for most of the time.

The Osceola rounded to on a starboard helm, the Hercules remaining at the tail of the tow until it had straightened out, and then, finding all clear, she went up alongside the port hawser boat so as to be in a position to push the head of the tow in to Fifty-Fourth street at the proper time.

These ten suits were brought against the tugs, and the Cornell Steamboat Company, claimant, impleaded under the fifty-ninth and fifty-sixth rules in admiralty the steamer Pathfinder, charging her with being anchored in midstream and giving no fog signal, and also the Director General of Railroads, operating the New York Central Railroad Company, charging him with liability for the damage. It also brought two suits on account of boats in the tow against the Director General, charging that navigating car floats of the New York Central Railroad Company coming into collision with the port and starboard sides of the tow respectively caused the port hawser to part and the tow to break up and drift downstream on the ebb tide. The Cornell Steamboat Company did not bring in the steamship Pathfinder and offered no evidence at the trial against the Director General of Railroads.

The Cornell Steamboat Company, in its petitions filed February 27, 1922, in the cases of Williams Line, Inc., against the tugs Osceola and Hercules, and of James A. McAllister against the tugs Osceola and Hercules, impleading the Director General, addressed the following interrogatory to him:

"First Interrogatory. (a) State the names and/or numbers of any and all of your vessels which were in collision with any other vessels on December 10, 1919, between 1:30 a. m. and 4 a. m., at any point in the Hudson river between Seventy-Ninth street and Fiftieth street, New York City. (b) What was the name of the vessel collided with, and was she alone or in a tow with other vessels? (c) At what time, and at what point in the river did the collision occur? (d) From and to what points were your vessels (referred to above) proceeding at the time of the collision; and (e) state in detail the circumstances of the collision and how it occurred."

January 22, 1924, the Director General answered as follows:

"Answer to First Interrogatory. The following is an account of all collisions involving the New York Central Railroad Company's vessels that occurred on December 10, 1919, between 1:30 a. m., and 4 a. m., in the Hudson river between Seventy-Ninth street and Fiftieth street, New York City.

"The New York Central Railroad Company's floats No. 21 and No. 13 were made fast at the end of the dock 1, North River, when at about 3:15 a. m. a tow came down the river apparently broken up and out of control, and came in contact with said floats, breaking them adrift. Respondent believes that the steam tugs Osceola and Hercules had this tow in charge, but does not know which one of the boats in said tow struck said floats.

*    *    *    *    *

"Answer to Third Interrogatory: Car

floats No. 21 and No. 13 were moored at the end of Pier 1, North River, as stated above. Said floats were moored abreast of one another broadside to the end of the dock. The width of car float No. 21 is 40.2 feet; the width of float No. 13 is 41.1 feet. The outermost float extended about 81½ feet beyond the outside line of the end of the dock."

The New York Central piers extend from Seventy-Second street to Fifty-Ninth street and from Pier 99 to Pier 108. It is quite clear to me that the boat Schmoll, outside boat on the starboard side of the tow at the tail end, was in collision with a New York Central car float lying at the end of its Pier 1, some 300 feet inside of the pier head line, her offshore side being 81½ feet outside the pier. The fact that the Cornell Steamboat Company did not attempt to prove the allegations of its libels against the Director General amounts to an abandonment of this defense.

[2] The first question is whether the collision happened before or after the port hawser parted. The tugs knew of no trouble until it did part and I cannot see how the tow could possibly have gone 220 feet inside the pier head line, even if it had been drifting down close to that line, much less if it was drifting down, as the Cornell Steamboat Company contends, 500 feet off the pier ends. It is much more probable that in the general break-up and spread of the tow following the parting of the port hawser the boat Schmoll was pushed and drifted in against the car float lying at the end of this pier. Indeed the Cornell Steamboat Company makes no claim that the tow struck the pier. If so, the cause of the damage to the tow was the parting of the port hawser when the Osceola was putting an unusual strain upon the hawsers by bringing the tow hooked up against the strength of the ebb tide. If the tow had been broken up by a collision with the car float at the pier, I think the tugs would not have been liable because, even though exercising due care, they did not know how close the tow was to the pier ends. I discover nothing in the case to make the helper tug Hercules liable.

[3] The defense of the Cornell Steamboat Company, claimant, is inevitable accident and upon that question the case of the Merchant Prince, Prob. Div. [1892] 179 Asp. Mar. Law Cases, 208, has been continuously followed in this circuit. The Edmund Moran, 180 F. 700; Bradley v. Sullivan (C. C. A. 6) 209 F. 833; The Lackawanna, 210 F. 262; In re Reichert Towing Line, 251 F. 214; The Anna C. Minch, 271 F. 192.

[4] To sustain this defense the defendant

must prove, if the cause of the accident is shown, that he did not by want of care and skill according to the circumstances contribute to it or that he could not have prevented it by the exercise of much care and skill. On the other hand, if the cause is not shown, then the defendant must show all possible causes, and that he was not responsible for any of them. The parting of the port hawser, of course, caused the accident in a general sense; but the question under this defense is what caused it to part. The Cornell Steamboat Company abandoned at the trial the explanation that the hawser broke because of collisions between crafts of the New York Central Railroad Company and the tow, and I have found against it in respect to the alleged collision with the New York Central car float lying at its Pier 1. The inquiry therefore is: What were the possible causes for its breaking?

The claimant sent the broken part of the port hawser and also a part of the starboard hawser to the manufacturer to be tested. They are described as ¾-inch wire rope, or, including the wrapping or services, 1⅛-inch wire rope.

The expert witness testified that the wire rope as manufactured had a breaking strain of 31,400 pounds to the square inch; that the break in the port hawser was bright, and showed that it was the result "of a full strength pull"—that is, pull to the breaking point—and that there was no latent defect. When broken in the testing machine, three strands broke at 33,870 pounds and two at 33,350 pounds. The testimony is that the whole rope never broke in the testing machine, and the fact that the port hawser did break entirely indicates that it was under a greater strain than the testing machine gives. A sudden strain will exert more pressure than a steady strain.

The case then stands thus: A hawser which the claimant says was entirely adequate for the size of the tow, and which it has proved was in good condition and without defect, parted when being used. One possible cause of this might be its insufficiency to stand the strain put on both hawsers by the Osceola, if she was towing with a steady pull on both, and another might be its insufficiency to stand a sudden strain put on it. That the starboard hawser, whose strength tested about the same, did not part, seems consistent with a sudden strain on the port hawser as, for instance, to get the tow in closer to the pierhead line preparatory to tying up at Fifty-Fourth street. The Cornell Steamboat Company has not shown that by the exercise of care and skill

according to the circumstances one of these things could not have been avoided.

Decrees may be submitted as follows:

Coughlin against the tugs Osceola and Hercules: An interlocutory decree for the libelant against the tug Osceola. The libel against the tug Hercules and petition against the Director General to be dismissed without costs in each instance.

James McWilliams Blue Line against the tugs Osceola and Hercules: A similar decree.

Philip Goldrick against the tugs Osceola and Hercules: A similar decree.

Brigham Bros. against the tugs Osceola and Hercules: A similar decree.

Charles F. Schleede against the tugs Osceola and Hercules: A similar decree.

Williams Line, Inc., against the tugs Osceola and Hercules: An interlocutory decree for the libelant against the tug Osceola, the libel against the tug Hercules to be dismissed without costs, and the petition against the Director General to be dismissed with costs against the Cornell Steamboat Company.

James A. McAllister against tugs Osceola and Hercules: A similar decree.

Empire Brick & Supply Company against tugs Osceola and Hercules: An interlocutory decree for libelant against the tug Osceola; the libel against the tug Hercules and the petition against the Director General to be dismissed without costs in each instance.

James J. Dwyer et al. v. Director General of Railroads: The libel to be dismissed without costs.

Hudson River Blue Stone Company v. Director General of Railroads: A similar decree.