### THE HERKIMER.

MILMINE BODMAN & CO., Inc., v. EMPIRE CANAL CORPORATION et al.

NORRIS GRAIN CO. OF NEW YORK, Inc., v. SAME.

Nos. 340, 341.

Circuit Court of Appeals, Second Circuit.

July 21, 1931.

Rumsey & Morgan, of New York City (Mark W. Maclay and John Tilney Carpenter, both of New York City, of counsel), for appellant.

Otto & Lyon, of New York City (George V. A. McCloskey and Henry E. Otto, both of New York City, of counsel), for appellee.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

SWAN, Circuit Judge.

Each of the libelants contracted with Empire Canal Corporation, a private carrier, for the carriage of a quantity of grain from Buffalo to New York through the State Barge Canal. A full cargo of rye belonging to Milmine Bodman & Co. was laden on board the steel barge U. S. No. 217, and a similar cargo of wheat belonging to Norris Grain Company of New York was laden on board the steel barge U. S. No. 237. These two barges, together with two others, were taken in tow by the steel canal steamer Herkimer. All vessels of the fleet were owned by New York Canal & Great Lakes Corporation, but were under demise charter to Empire Canal Corporation. While proceeding with her tow through Lake Oneida on September 6, 1924, the steamer encountered a storm, and at Sylvan Beach, which is the entrance to the barge canal at the eastern end of said lake, the two barges carrying libelants' grain broke adrift, with resultant damage by water to their cargoes.

The court below condemned the navigation of the steamer in several respects, but, appellant contends, without just cause as to any of them. This necessitates a review of the several charges of fault, which may be grouped into three classes: (1) Negligence in setting out to cross Lake Oneida; (2) negligence in proceeding after the storm arose; and (3) faults of navigation in entering the gap at Sylvan Beach.

1. The Herkimer was condemned for setting forth upon the voyage across the lake on the morning of September 6th. Departure was made from Brewerton at the western end of the lake about 7 a. m. Two hours earlier, at Lock 23, the master of the Herkimer had obtained the official weather report for the twenty-four hours beginning at 10 a. m. on September 5th, which read as follows: "September 5, 1924—Fair tonight and Saturday; slightly cooler tonight; northwest winds becoming fresh." The official report for the next twenty-four hours would have been available at Brewerton about 10 a. m. on the 6th, and, had the master waited for it, he would have learned that the prediction was fair weather and "moderate westerly winds." "Moderate" means a maximum wind velocity of 18 miles per hour, while "fresh" denotes from 19 to 24 miles per hour. Neither moderate nor fresh winds were thought unsafe for navigation. It was not the practice at that time to warn vessels off the lake unless the wind reached about 30 miles an hour. On account of the shallowness of the lake, a 30-mile wind would create dangers to navigation, and, particularly if it came from the northwest, would make hazardous the entrance to the canal at the eastern end of the lake. During the course of the Herkimer's 21-mile voyage between Brewerton and Sylvan Beach, the wind increased until, as the court found, it reached a velocity of from 35 to 45 miles an hour. Such a storm had not been officially predicted, nor were there any observable conditions at Brewerton or elsewhere on the lake to give warning of it when the Herkimer set forth at 7 o'clock. At that hour only a moderate westerly breeze was blowing. This is the testimony of the libelants' witnesses as well as of appellee's. It was not until about 8 o'clock that the wind began to freshen and not until about 9 that it reached a velocity that prompted the weather observer stationed at Cleveland, which is 13 miles down the lake from Brewerton, to telephone to the master of the tug National at Sylvan Beach that the Herkimer and her tow were out on the lake. They were then a mile or two west of Cleveland. The Herkimer's departure from Brewerton must be judged by the conditions which existed at the time her master decided to set out upon the

royage, not by what later developed. The Mary T. Tracy, 8 F.(2d) 591, 593 (C. C. A. 2); The Clarence L. Blakeslee, 243 F. 365 (C. C. A. 2); The Allie & Evie, 24 F. 745, 748 (D. C. N. Y.). The court below considered it a fault to leave Brewerton "without making some effort to ascertain what the weather conditions were on the lake." Inquiry by telephoning Cleveland or Sylvan Beach at 7 o'clock would have ascertained merely that there was a moderate westerly breeze. At that hour there were no observable conditions to indicate danger. This was not a case of disregarding storm warnings, as in Larsen v. Cahill Towing Line, 6 F. (2d) 982 (C. C. A. 2). It is true that, if the Herkimer's master had awaited the 10 o'clock weather forecast, although the forecast would have given no warning, the physical conditions which then existed on the lake were such as to make setting out unsafe. Whether such conditions were then apparent at Brewerton is not clear, although they certainly could have been ascertained by telephoning to Cleveland or Sylvan Beach. But we know of no obligation on a master to tie up for three hours to await a weather report, or indeed to make any inquiries, before embarking upon a voyage of only a few hours' duration, when all observable conditions are favorable at the time of departure. The Victoria, 95 F. 184, 186 (C. C. A. 2); The Hackensack (D. C.) 291 F. 69, 71, affirmed 291 F. 73 (C. C. A. 2); The Headlight, 300 F. 84 (C. C. A. 2). Under conditions existing when he set out, we find that the master was justified in his decision to proceed.

■ 2. It is urged that the Herkimer was at fault for not returning to Brewerton or Cleveland after the storm arose. Returning to Brewerton would have necessitated rearranging the tow in the middle of the lake and towing three of the barges stern first; heading for Cleveland would have meant proceeding in the trough of the waves instead of going with them. Either course would have involved danger after the storm became severe; and, until it did, Captain Wimett had no reason to suppose that he could not proceed with safety. The master of the tug National, which came out to give assistance, was of opinion that the safest course at that time was to continue to Sylvan Beach. The District Court made no finding that the captain did not act with prudence in proceeding, and we do not think the evidence requires us to so find.

3. So liability, if it exists, must be predicated upon faults of navigation in entering the gap. Several such faults are asserted.

■■ (a) Complaint is made that the hawser was not shortened before entering the gap. The evidence as to this was conflicting, and the judge said that he was "not convinced" that it was shortened. The burden of proving negligence was upon the libelants. Before imposing liability on this ground, the court should have been convinced that the master did not shorten the hawser rather than "not convinced" that he did. There was considerable testimony that the hawser was shortened. The Herkimer had a towing machine for that very purpose, and it seems highly improbable that an experienced master would have entered the gap in a gale with a 300 or 400 foot hawser, which concededly would have been dangerous. It is much more likely that it was shortened, as Captain Wimett and several other witnesses testified.

■■ (b) The court found that the Herkimer approached the gap at a speed of at least 3 miles per hour, which was excessive, and that her captain "did not take into consideration the cross current or backwash from the south breakwater." When the fleet left Brewerton it was made up with one of the barges ahead of the Herkimer as a "push boat" and three barges in a section tailing astern on a single hawser of between 350 and 450 feet in length. Behind the hawser barge were the No. 237 and No. 217. The libelants criticize the make-up of the tow with a push boat, but there is no finding below that it was faulty, and we do not so find, though concededly it was unusual. When the tug National met the fleet and offered assistance, it was directed to put a towing line on the push boat and in that formation they proceeded. The arrangement of breakwaters at the gap created cross currents and a backwash from the south breakwater which made navigation particularly difficult when the wind was from the northwest. With the National ahead, the fleet proceeded at half speed directly into the gap in the center of the channel between the breakwaters. The master of the National, who was the libelants' principal witness as to events at this juncture, testified that both speed and course were correctly chosen. The three barges astern were rigged to assist in keeping in line by steering themselves, and a speed of $2\frac{1}{2}$ to 3 miles, the captain testified, would enable them to follow straighter than under a lesser speed. The

center of the channel was selected because the wind and waves would tend to set the barges upon the south breakwater, while the backwash would tend to set them upon the breakwater to the north. Captain Wimett was familiar with the conditions to be expected, and we do not think there is any evidence that he failed to take into consideration the cross currents between the breakwaters or that his speed, if it was excessive, was more than an excusable error of judgment in difficult circumstances.

■■ (c) While the fleet was attempting to enter the gap, the two rear barges broke adrift, and there is a dispute whether the parting of their lines was due to the hawser barge hitting the north breakwater or to the jumping of the barges in the confused sea and cross currents produced by the breakwaters. The opinion states that the weight of the evidence points to the finding that the hawser barge struck the north breakwater, and this was relied upon as raising a presumption of negligence, citing United States v. Norfolk-Berkley Bridge Corp., 29 F.(2d) 115 (D. C. E. D. Va.). The witnesses on the tug National, who were some distance away, testified that the hawser barge did strike, and Exhibit 8 contains an admission by an agent of the owner that the breaking adrift was caused in this manner. On the other hand, witnesses on the Herkimer and the barges deny the striking. They are corroborated by a fisherman on the end of the north breakwater. He was in the best position to observe, and testified positively that the hawser barge did not strike. An examination of that barge failed to disclose any evidence that she hit anything, and it seems improbable that, had she struck with force enough to whip off the two rear barges, she would have suffered no damage. But, even though the District Court's finding be adopted, it does not follow that liability would result. The striking of a stationary object by a moving vessel raises a presumption of negligence, it is true, but that presumption may be rebutted by proof that the moving vessel was navigating in an emergency and the course taken in the emergency was such as might reasonably have been taken by a prudent and skillful navigator. Wilmington Ry. Bridge Co. v. Franco-Ottoman S. Co., 259 F. 166 (C. C. A. 4); The Worthington and Davis, 19 F. 836 (D. C. E. D. Mich.). We regard the case at bar as governed by this principle. When the Herkimer set out there were no weather conditions which made hazardous the passage across the lake. Her master was justified after the storm arose in continuing to Sylvan Beach, and what occurred in attempting to enter the gap was due to the dangers of navigation in a confused and treacherous sea, not to faults in navigation.

This disposition of the case renders it unnecessary to consider the questions which have been argued as to the application of the Harter Act (46 USCA §§ 190–195).

The decrees are reversed, and the libels should be dismissed, with costs to the appellant.