## RIDEOUT v. CHARLES NELSON CO.
### No. 6541.

Circuit Court of Appeals, Ninth Circuit.

Feb. 1, 1932.

Resleure & Hill, of San Francisco, Cal., for appellant.

Irving H. Frank and Nathan H. Frank, both of San Francisco, Cal., for appellee.

Before WILBUR and SAWTELLE, Circuit Judges, and McCORMICK, District Judge.

McCORMICK, District Judge.

A few minutes after midnight of July 7, 1930, the steamer Doylestown, a steel freighter, 2,600 ton gross and 300 feet in length over all, while attempting to dock at the private wharf of the Sperry Flour Company at Vallejo, Cal., brushed the side of the tugboat Halcyon, driving her on the barge Rideout No. 5 and squeezing both tug and barge against the dock to which they were moored, thereby causing damage to them. Their owner filed a libel against the Doylestown and her owner in the District Court for the Northern District of California to recover damages. Issue was properly joined, and after a hearing on the merits the district judge filed a memorandum opinion [50 F. (2d) 439] wherein he found the Doylestown free from fault and exonerated her from any liability for the collision. A final decree dismissing the libel with costs was accordingly entered, and this appeal by the libelant is from such decree. The assignments of error are numerous but relate entirely to the findings of fact by the trial court and its application thereto of rules of law. It is therefore unnecessary to consider or discuss the assignments seriatim.

Appellant concedes that the facts are substantially correctly stated in the opinion of the district judge. That opinion and the record before us, which we have examined, discloses the following situation. The dock in question is about 725 feet long with its face lying northerly and southerly. The damaged barge, Rideout No. 5, with its attached towboat Halcyon, was moored along the face near the south end. Toward the north end, also alongside the face of the dock, there was moored another barge, Rideout No. 6, also with an attached tugboat, the Penguin. Both docks and barges were owned and operated at the time of the collision by the libelant, appellant herein, E. V. Rideout Company. Each barge and tugboat was about 110 feet long and extended out from the dock approx-

imately 50 feet. Both the tugs and barges carried proper lights at the time of the collision. The clearance or space between the two barges that were thus moored along the face of the dock was estimated by the captain of the Doylestown to be about 360 feet. There is other credible evidence showing this clearance to have been approximately 450 feet.

Before leaving San Francisco on the afternoon of July 7, the master of the Doylestown made arrangements with the Sperry Flour Company to dock at the Vallejo wharf about twelve o'clock midnight following. He was assured that the landing would be free and unoccupied at that time. Instructions to keep clear for the Doylestown at the appointed time were received by the Sperry Company employees at the Vallejo wharf during the afternoon, and the officers of both tugs and barges were told of this requirement, either in the early evening of July 7 or during that night, and at least an hour prior to the arrival of the Doylestown.

Barge No. 6 had been loading cargo at door 20 of the dock. This was the opening through which the Doylestown was to be loaded and in front of which she was to dock according to previous arrangements. Although this barge finished loading between eight and nine o'clock that night, she did not pull out or leave the face of the dock to make berth for the Doylestown, as those in charge of her had been twice told to do by the dock watchman and as they had agreed to do, but instead she was pulled along the dock's face, closer to the northerly end thereof, and tied up in such position, where she remained at the time of the collision. The reason her officers assign for not leaving for San Francisco when loaded, as they had promised to do, was that they were waiting for a convenient and favorable ebb tide. It was proven, however, that high water occurred at Vallejo on July 7 at 10:45 p. m. and that ebb tide began there immediately. It was also shown that as soon as this barge was moved northerly along the dock her officers and those of her tugboat "turned in" and gave no further attention to the Doylestown's movements or to dock conditions until after the collision.

Barge No. 5, with the tug Halcyon, arrived at the wharf about 10:45 p. m. of the night in question. She was first moored just south of barge No. 6, and, upon being told by the dock watchman that a steamer was coming in at midnight and that the barge must be moved out of there, she was merely pulled along the face of the dock to the southerly

end thereof, where she was tied when the collision happened. There is a conflict in the testimony as to whether those in charge of barge No. 5 were told by the dock watchman to moor on the face of the dock near the southerly end or to moor around the southerly end thereof. The trial court found that this barge could have and should have tied up around the end of the wharf. Such finding, having ample support in the evidence, will not be set aside on appeal. The Yucatan (C. C. A. 9) 226 F. 437.

The Doylestown, with her captain on the bridge, third mate and quarter master in the wheelhouse, and a proper lookout stationed in the bow, approached the dock at a slow speed of four miles, or less, per hour through a narrow channel. The master seasonably blew the proper landing whistle indicating his intention to dock. It was a moonlight but somewhat cloudy night. It was very dark, however, along the shore line of the Sperry mill. There was a strong northwesterly breeze at the time and the tide was setting in the same direction and toward the dock. The steamer's course was properly directed for the north end of the wharf and to door 20 thereof, where she had previously arranged to berth, but which was observed by the ship's officers to be occupied by the tugboat and barge No. 6. This situation was first seen by the ship's master when about 1,200 feet south of the dock. At that point, on account of the arrangement of the lights upon and about the dock and by reason of the position of the moon and because of shadows thrown over the south end of the wharf and surrounding waters, the location of barge No. 5 and its towboat, toward the southerly end of the dock, was illusory. They and their lights then appeared to the officers and lookout of the Doylestown to be moored on the inside of the dock. Upon seeing her berth at the north end unavailable and having then sufficient headway to make this expected and promised berth, the master of the Doylestown backed the ship full astern in order to take the headway off. At that time the steamer, slowly moving, was about 300 feet south and about 100 feet off the dock. Then for the first time the real position of barge No. 5 and her tugboat was discernible and revealed to the Doylestown. They were so moored at the dock as to prevent their being visible to incoming vessels until that position was reached. The tide and wind were then setting the steamer toward the dock and threatened to push her against barge No. 5 and the Halcyon. The wheel was put hard astarboard for the pur-

pose of swinging the Doylestown away from the dock, and she was placed on half speed ahead in an effort to get the ship out in the stream so as to avoid the dock, barges, and tugs and enable her to proceed to the turning basin some distance northerly. The wind and tide were so strong that the maneuver was impossible without hitting the tugboat and barge and sideswiping the dock with the stern. Thereupon, and in this extreme emergency, the wheel was changed hard aport, and the bow of the ship put directly behind barge No. 6. The master realized that he would have to dock between the two barges, with tide and wind setting the ship toward the wharf. It is clear that when he was able to discover where the Halcyon and barge No. 5 actually were he found himself in a trap. Instant and decisive action was necessary. There was no time for deliberation. Owing to the slow speed at which he had felt required to cautiously move, and the prevailing weather and tide conditions, the vessel did not respond to the helm. A line was passed to the dock and made fast. The engines were stopped, and the master attempted to let the steamer drift into a position between the barges. This maneuver was not a success and consequently, before the vessel could be berthed between the two barges, the tide and wind set her against a sharp guard upon the tug Halcyon that projected about ten or twelve inches above the water line, pushing the tug against barge No. 5 and squeezing and damaging both.

There is substantial evidence in the record before us that justifies the finding of the District Judge that the available space between the barges and tugs was sufficient to warrant the master of the Doylestown, in the exercise of due care and prudence and under all the circumstances, to attempt the docking maneuver with reasonable belief and expectation that it could be accomplished in safety. We cannot see that the captain omitted any precaution in this regard which a vigilant master should have exercised.

The record reveals one further significant fact. It was proven that the captain of the Halcyon, having been told by the dock night watchman of the expected arrival of a steamer, and being anxious to see how large she was, watched the movements of the Doylestown from the time that she was entering Mare Island Strait, a mile away, for a period exceeding fifteen minutes and until the collision with his tug was imminent, and gave no warning or danger signal of any kind. He did nothing to prevent the collision.

We agree with the finding of the court below, "that it was the presence of libellant's barges which caused all the trouble." If either barge and attendant tug had been moored around the end of the dock instead of on the face thereof, or if barge No. 6 had left for San Francisco when it had agreed to, or if barge No. 5 had been moored alongside of barge No. 6, near the northerly end of the dock, there would have been no collision.

Moreover, if the tug Halcyon had dropped away from the side of barge No. 5 when it was obvious to the tugboat captain that the Doylestown intended to dock and must do so in the space between the two tugs and barges, there would have been no damage done, because if an impact had resulted it would have been caused by the flat side of the steamer against the flat side of the barge, and no injury would have occurred. The damage done in this collision, as already stated, was caused by the contact of the Doylestown with the sharp guard around the tug Halcyon. It was undisputed that the Halcyon could have moved away from the barge in five minutes.

The failure of the Doylestown to correctly observe the true position of barge No. 5 or the Halcyon, or the lights thereon, until she was within 300 feet of the dock cannot be attributed to the fault of the vessel or of its officers. The ship was seaworthy in every respect. Her machinery, steering apparatus, and general equipment was efficient. The lookout was vigilant, undividedly attentive, and properly stationed in the bow, and neither he nor the experienced master on the bridge could earlier observe the real position of the Halcyon and barge No. 5, or the lights upon them. The active fault in this particular, that proximately caused this collision, was the indifferent and careless manner of mooring barge No. 5 and its tug Halcyon on the face of the dock, where the lights and shadows rendered their real position to incoming ships deceptive, and where they were so arranged that the Doylestown was misled, notwithstanding the exercise of requisite care.

Appellant complains because the first mate was doing the lookout's duties. However, he had no other duties to perform at the time. There were no unusual circumstances that required a lookout to be stationed in either bow. In fact, it was clearly shown that the lookout saw and observed everything apparent and possible. We cannot discover that the captain of the Doylestown omitted any precaution which a vigilant and experienced master should have exercised. His conduct cannot and should not be measured by ordi-

786

nary, usual, and expected conditions. He was caught in a trap created not by his own imprudence or fault, but brought about by the indifference and carelessness of libelant's agents. He was required to exercise and employ quick and decisive action. Under such circumstances, he acted upon his best judgment, and, as the Supreme Court said in The Oregon, 158 U. S. 186, 204, 15 S. Ct. 804, 812, 39 L. Ed. 943, "the judgment of a competent sailor in extremis cannot be impugned." Or, as was stated by that court in The City of Paris, 9 Wall. (76 U. S.) 634, 638, 19 L. Ed. 751: "The acts complained of were done in the excitement of the moment, and in extremis. Whether they were wise it is not material to inquire. If unwise, they were errors and not faults. In such cases the law in its wisdom gives absolution."

It may be, as was suggested in the opinion of the district judge, "that if when the master of the steamer first realized the situation facing him, he had dropped his port anchor and gone full speed astern he might have avoided the collision for then the tendency of the propeller would have been to hold the stern up against the wind and tide." It is easy to say after an accident that something could have been done to lessen the possibility of one. In this case, the question is whether at the time and under the circumstances reasonable prudence by the Doylestown was observed. We believe it was.

■ It is undoubtedly an established rule in admiralty that where a steamer in motion comes into collision with a motionless vessel there is a presumption of fault on the part of the moving ship, and that the burden of proof lies on her to show clearly that the collision was inevitable, or that the motionless vessel was to blame. 11 C. J. 1179, and cases there cited. The court below correctly applied the aforesaid rule to this case and held that the Doylestown had clearly overcome the presumption of negligence by proving that it was without fault under the circumstances, and also that the presence and placement of appellant's barges and tugs by its agents was the proximate cause of the collision. The evidence upon many material factual issues is conflicting. The proof was adduced by oral testimony from living witnesses who testified in person before the trial court, and the trial judge therefore had the better opportunity of determining their credibility and of reaching accurate conclusions on the disputed facts; and, as this court stated in The Yucatan, 226 F. 437, the rule is well settled that the findings of a trial judge in admiralty

will not be set aside except for clear and manifest error. See, also, The Vigilant (C. C. A. 9) 35 F.(2d) 846. We find no error in the findings of the court below. It follows, therefore, that the trial court having applied the correct rule of law, and having reached the conclusion that the Doylestown had sustained the burden of proof and had overcome the presumption of negligence, its decree should be affirmed, and it is so ordered.