### THE ELIZABETH M. BAKER.
### THE BLACK HAWK.

### THE JOSEPH F. MESECK.
### THE EUGENE MESECK.

### THE TOP SERGEANT

### THE NEW YORK CENTRAL NO. 20.
#### Nos. 228–230.

Circuit Court of Appeals, Second Circuit.
Feb. 19, 1934.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (Robert S. Erskine and A. V. Cherbonnier, both of New York City, of counsel), for The Joseph F. Meseck and Meseck Towing Lines, Inc.

Hunt, Hill & Betts, of New York City (John W. Crandall, of New York City, of counsel), for The Black Hawk and appellant American Diamond Lines.

Jacob Aronson, of New York City (Kenneth O. Mott-Smith, of New York City, of counsel), for The New York Central No. 20 and New York Cent. R. Co.

Foley & Martin, of New York City, for The Top Sergeant.

Macklin, Brown, Lenahan & Speer, of New York City (Paul Speer, of New York City, of counsel), for Annie Baker, as Owner of The Elizabeth M. Baker, Smith-Murphy Co., Inc., owners of cargo of wheat, and Joseph A. Ryan, owner of The Marion Ryan.

John E. Purdy, of New York City for The Eugene Meseck.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

MANTON, Circuit Judge.

The Black Hawk, a vessel of 4,988 gross tons, 401 feet long and 54 feet beam, bound for Antwerp, Belgium, on December 29, 1932, left her pier for the voyage. She was lying bow in, at the south side of Pier K, inside a sister ship, the Black Heron. Alongside the Black Heron lay the grain elevator, Oswego, which was there to load grain on the Black Heron when the Black Hawk left her dock. At the end of the pier were four barges placed there that morning and extended out river. A line of dolphins ran parallel to Pier K, 200 feet to the south; the outer dolphin being 200 feet inside of the pier line. The Meseck Towing Lines, Inc., under contract to undock the Black Hawk, sent two tugs, the Joseph F. Meseck and the Eugene Meseck, to do so. They were at hand at 8:40 a. m. Before the Black Hawk cast off her lines, the Top Sergeant with the grain boats in tow, tandem, approached the slip on the south side and was advised not to load any grain on the Black Heron until the Black Hawk had left and also not to allow grain to be landed alongside the elevator. The Top Sergeant later landed the grain boats alongside the barge P. R. R. No. 498, one of the barges at the end of the pier. Two lines were put out from the bow of one of the barges, the Elizabeth M. Baker, to the P. R. R. No. 498, and the other tailed out into the river at an angle between 20° and 45° to the inside barges. The New York Central No. 20, a shifting tug, was directed to stand by and move them to the south side of Pier K after the Black Hawk had undocked. After this order, she made fast to an ash scow on the south side of Pier K, and did nothing further until the Black Hawk started out. She then made fast to the grain boat Marion Ryan, and was lying alongside when a collision occurred between the stern of the Black Hawk and the Elizabeth M. Baker.

When the Black Hawk started out, the tide was running flood, weather clear and a light breeze from the north. Her master, third mate, helmsman, a Sandy Hook pilot, and the captain of the Eugene Meseck were on the bridge. The last named, Captain Martin, was in charge of the undocking of the ship. The tugs breasted the Black Hawk

out from the pier and shaped her up in the slip, and, when ready to back out, the Eugene Meseck was on her stem and the Joseph F. Meseck was on her port quarter. A slip whistle was blown followed by three blasts, and she started backing with the Joseph F. Meseck pulling on her port quarter and the Eugene Meseck pushing. The Joseph F. Meseck used her own hawser, which was put through the center stern chock of the Black Hawk and over to the starboard stern bitt; the eye of the hawser being placed over the after bollard of that bitt. The Joseph F. Meseck went around to the southward of the dolphin, which protruded from 12 to 15 feet out of the water, slackened her hawser, and lifted it over the dolphin, and then took up on the slack. Immediately afterward the hawser parted in its eye, and then the Black Hawk's stern sagged upstream. There was no opportunity for the Meseck to go around on the steamer's starboard quarter and push. Captain Martin on learning of the parting of the hawser, ordered the ship's helm held hard astarboard and gave a jingle to the engine room, meaning that the engines already full astern should be given all steam possible. But the Black Hawk's stern continued to swing upstream, and, after she had grazed two of the inside barges, her stern struck the Elizabeth M. Baker and forced her back against the Marion Ryan, causing the damages for which the libels were filed. Her engines were stopped shortly before the collision and remained stopped until she had cleared. The grain boats broke adrift from the other barges and drifted up the river on the flood tide. The Elizabeth M. Baker sank, and the Marion Ryan was taken back to Pier K. The court held the Joseph F. Meseck, the Black Hawk, and the New York Central No. 20 at fault. Liability was imposed upon the Black Hawk for not moving the grain boats from the end of the pier or requesting their removal before the Black Hawk started to undock and proceeded out. The No. 20 was held for not promptly obeying the order to stand by the grain boats and in failing to order the captain of the Elizabeth M. Baker to cast off his lines. All others were exonerated from fault.

 No fault was attributable to the Black Hawk for this collision. When a slow astern order was given, she blew a slip whistle of three blasts and put her engines full astern. No complaint can be made of this direction. This was the customary manner of leaving the slip either at flood or ebb tide. It was after this order "full astern" that the hawser broke. And Captain Martin properly gave the engine room a jingle, ordering the helm hard astarboard and instructed the bow tug, Eugene Meseck, to go ahead hard. There is testimony that the Black Hawk, with a right-hand screw, had a tendency to back to port with her helm amidships and the hard astarboard helm with engines reversed was intended to force the Black Hawk's stern still more to port and away from Pier K. If the order had been to stop the engine when the hawser parted, there would have been nothing to counteract the force of the flood tide, and her stern would have swung upstream more rapidly. If her engines were stopped or put ahead she would have collided with Pier K. From the parting of the line until the collision, it is estimated that but a minute elapsed. This situation required immediate action, the use of the navigator's best judgment, and the order given was the best direction under the circumstances. The Oregon, 158 U. S. 186, 15 S. Ct. 804, 39 L. Ed. 943; The City of Paris, 76 U. S. (9 Wall.) 634, 19 L. Ed. 751; Rideout v. Chas. Nelson Co., 55 F.(2d) 783 (C. C. A. 9).

 Nor was the Black Hawk blameworthy for starting out with the grain boats at the end of the pier. If the hawser had not parted, the boats would not in any way have interfered, and navigation out into the river would have been safe. Upon the theory that Captain Martin was the agent of the Black Hawk and of her owner, and not the agent of the Meseck Towing Lines, Inc., the court below held that the ship was negligent in leaving the pier without notifying the grain boats to move or having them moved. This was based on Captain Martin's knowing the grain boats were at the end of Pier K and on his having said that, if he had known the grain boats were there, he would not have gone out. Captain Martin was in charge of the undocking of the vessel, and, as between the Black Hawk and the Towing Company, he was the former's agent. Sun Oil Co. v. Dalzell Towing Co., 287 U. S. 291, 53 S. Ct. 135, 77 L. Ed. 311; cf. The Dorset, 260 F. 32 (C. C. A. 4). Liability in rem presupposes that a vessel colliding with another has been guilty of negligent navigation. The Black Hawk's navigation cannot be criticized. Indeed, the court held that there was no fault in the navigation of the Black Hawk and that the presence of the grain boats at the end of the pier was not a contributing cause to the collision. Captain Martin's statement that he would not have left could not impose liability on the Black Hawk. The Daniel B. Flannery, 282 F. 545 (C. C. A.

2); The Daniel McAllister, 258 F. 549 (C. C. A. 2); The Baker Bros., 260 F. 650 (C. C. A. 2); N. Y. Central No. 18, 257 F. 405 (C. C. A. 2); The Allemania, 231 F. 942 (C. C. A. 2). The Black Hawk made proper allowances for the tide by having the Joseph F. Meseck pull on her port quarter. She had sufficient tugs and was going out 100 feet south of Pier K. This navigation would have avoided any possibility of collision except that the hawser broke. She may not be held negligent under these circumstances; she was not obliged to anticipate a breaking of the hawser.

As to the New York Central No. 20, it appears that the American Diamond Lines had a lease of the south side of Pier K, with permission to use the north side when it wanted it, from the New York Central Railroad Company. On the day in question, the American Diamond Lines was occupying the entire pier. The New York Central Railroad Company had furnished as the shifting tug The No. 20, which was used on this day. Before the Black Hawk cast off her lines, the No. 20 reported and was ordered by the stevedore employed by the Empire Stevedoring Company which loaded and discharged vessels at Pier K to go around and stand by the grain boats. She did so; the court so found. When the lines parted, the Joseph F. Meseck blew an alarm, and her captain shouted to the No. 20 to pull the grain boats out of the way. The captain of the Elizabeth M. Baker was on the bow of this boat and said he heard no orders from the No. 20 to cast off the Baker's lines. The court found no such orders were given. It appears that the Black Hawk was making about a knot and a half an hour going astern or 150 feet a minute. The evidence shows that the hawser parted some time between the time when the stern of the Black Hawk was 170 feet inside the pier and 30 feet from the dolphins and the time when it was about even with or 25 feet inside of the outer end of Pier K. The intervening time and space did not permit the No. 20 to perform the obligation sought to be imposed by the court.

The charge of negligence in failing to order the barge to cast off her lines would not be a fault unless the tug arrived in time to give that order, and this is inconsistent with the other act of negligence that she failed to promptly stand by and make fast to the grain boats. Moreover, the captain of the No. 20 was not to anticipate trouble in undocking. The contract between the New York Central Railroad Company and the steamship company for hiring the tug did not require any assistance in that undocking. The Black Hawk was under way, and the No. 20 and the Elizabeth M. Baker were at rest. It was the breaking of the hawser which was the proximate cause of the collision.

The defective hawser is sufficient to account for the disaster. The facts do not require holding this appellant. The City of New York, 147 U. S. 72, 13 S. Ct. 211, 37 L. Ed. 84.

Moreover, there is ample evidence to support the claim of this appellant that, when the hawser parted, orders were given to cast off, but the captain of the Elizabeth M. Baker was unable to execute the orders because of the brief interval of time that elapsed between the giving of the order and the collision. We think the testimony clearly requires exoneration of the No. 20. The Buenos Aires, 5 F.(2d) 425 (C. C. A. 2); The Fin MacCool, 147 F. 123 (C. C. A. 2).

The Joseph F. Meseck furnished a defective hawser which parted, and it alone should be held. Since her hawser broke, that appellant was obliged to show that the accident occurred in spite of the exercise of reasonable diligence. The parting of the hawser made out a prima facie case. The Osceola & The Hercules (D. C.) 18 F.(2d) 415, affirmed 18 F.(2d) 418 (C. C. A. 2); The Lackawanna, 210 F. 262 (C. C. A. 2); Davidson v. Amer. Steel Barge Co., 120 F. 250 (C. C. A. 2); The Olympia, 61 F. 120 (C. C. A. 6). It broke in its eye which is expected to be its strongest part. On conflicting testimony, the court found that the break occurred at a point where the hawser had been previously cut or chafed, which condition could have been seen upon inspection. It was weakened and was unable to resist either the sudden or constant strain, probably the former, which occurred. Argument is advanced to overcome the presumption that arose through the breaking of the hawser. But we think it is sufficiently established that the hawser was worn at the eye and that this caused its parting. This was due to a previous injury sustained or by previous wearing.

We find nothing in the lighterage clause or the towing contract which relieves the Meseck from fault. Calzavaro v. Planet S. S. Corp., 31 F.(2d) 885 (C. C. A. 4); The Portchester, 18 F.(2d) 75 (C. C. A. 2).

Neither the Top Sergeant nor the Baker were guilty of any faults which in any way contributed to the collision.

The decrees will be modified, and the Joseph F. Meseck and the Meseck Towing Lines, Inc., held liable, with directions to dismiss the libels as to the other appellants.

Decrees modified.