THE DALZELLINE.

THE LEVIATHAN.

DALZELL v. UNITED STATES LINES CO. et al.

No. 292.

Circuit Court of Appeals, Second Circuit.

April 5, 1937.

Burlingham, Veeder, Clark & Hupper, of New York City (Chauncey I. Clark and Stanley R. Wright, both of New York City, of counsel), for libelant-appellee.

Tompkins, Boal & Tompkins, of New York City (Arthur M. Boal, of New York City, of counsel), for United States Lines Co., claimant-appellee.

Clark, Carr & Ellis, of New York City (Paul A. Crouch, of New York City, of counsel), for respondent-appellant.

Haight, Griffin, Deming & Gardner, of New York City (James McKown, Jr., of New York City, of counsel), for United American Lines, Inc.

Kirlin, Campbell, Hickox & McGrann, of New York City (Robert S. Erskine, of New York City, of counsel), for United States Lines Operations, Inc.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

The decree below held the Jarka Corporation primarily liable and it appealed. The United States Lines Operations, Inc., was held to secondary liability and filed assignments of error. The suit grew out of the occurrences about to be stated.

While acting as one of five tugs assisting the S. S. Leviathan in undocking from Pier 86 North River early in the afternoon of November 25, 1930, the libelant's tug Dalzelline came into collision with a corner of a float stage and was so injured that she had to be beached. This suit was brought to recover the damages sustained. It originally was against the Leviathan, United States Lines Company appearing as claimant; United American Lines, Inc., and United States Lines Operations, Inc. Later the Jarka Corporation was by amendment made a respondent.

The evidence shows that five float stages were used to breast off the Levia-than from the pier. Three of them were especially built for this purpose larger than usual. They were owned by United States Lines Operations, Inc., which, however, merely furnished them for such use. The relationship of the parties to this action, to one another and to what was being done when the collision occurred is as follows: United States Lines Company owned the Leviathan; United States Lines Operations, Inc., was the operating company which operated the ship for the owner; United American Lines, Inc., was the lessee of Pier 86, North River, who had entered into a contract with United States Lines Operations, Inc., covering docking facilities for that ship at that pier including the furnishing by United American Lines, Inc., of necessary services on the dock and in respect to float stages; United American Lines, Inc., in turn made a contract with the Jarka Corporation, a stevedoring company, which provided that the Jarka Corporation would perform the dock and float stage service that United American Lines, Inc., had agreed to furnish under its contract with United States Lines Operations, Inc., which company did not have any employees of its own in service on the pier or in charge of the float stages; the libelant's tugs, including the Dalzelline and the Dalzellace, were engaged to and were assisting the Leviathan to undock when the collision occurred.

It was found on sufficient, though somewhat conflicting, evidence that as the Leviathan was backing out of the slip under her own power the two above-mentioned tugs "lay on the ship's starboard bow, and by working slow ahead as the ship backed away from the bulkhead, swung around into position to follow the ship straight out of the slip. The Dalzelline placed her bow fender against the ship's port bow 6 to 20 feet from the stem and the Dalzellace placed her bow fender directly on the ship's stem." This put the Dalzelline between the other tug and the pier and in that way it was found that the tugs were following the Leviathan out of the slip, the Dalzelline being under full speed ahead, when as its bow was nearly abreast of the middle float stage, that started to swing out from the pier because of the suction of the big ship and it did swing out to an angle of at least 30 degrees. The master of the Dalzelline at once had her engines stopped and put full speed astern but although she did drop

back a few feet from the Leviathan's bow, her headway was only checked and she struck the corner of the swinging out float stage on her starboard side from 25 to 35 feet from her stem, sustaining the damage to recover which this suit was brought.

■ The trial court also found on supporting evidence that it was impossible for the Dalzelline in keeping up with the Leviathan "to go out at any appreciable angle to the Leviathan's port side"; that she was in fact nearly in line with the ship when she struck the corner of the float stage; and that without fault on the part of the tug her injury "was caused by the float stage swinging out a minimum of 14 to 20 feet and probably 20 to 30 feet before the impact." As these findings are in accord with substantial evidence in the record we accept the facts found. They establish the swinging out of the float stage as the cause of the accident and recovery depends upon whether either of the parties held have been proved legally responsible for that swing. It is not now claimed that the other respondent or the ship is liable.

■ It was justifiably found that the Jarka Corporation made the lines of the stage fast to the pier. "These lines were of ¾ inch wire cable, about six fathoms in length, at the end of which was spliced 4 inch manila rope for handling. In mooring the Leviathan these were run to bollards or bitts on the string piece of the pier about twenty feet from each end of the float stage. Some slack on these was necessary to allow them to play when the ship bore down on them, and to allow for a 4.3 feet rise and fall of the tide and swell of the river and the surge of these outward, to a limited distance, when a ship undocked was a known and anticipated occurrence to tugmen." Before the Leviathan started out, the employees of the Jarka Corporation took up most of the slack in the lines of the float stages to prevent their being pulled out to gather such momentum as their weight of several tons would produce when they moved until they fetched up on their lines with a dangerous jerk. In spite of this taking up of the slack, the middle float stage did swing out as above found. Although the direct evidence did not show just what happened to the lines to make such swinging possible, the trial judge concluded "on all the testimony" that there was "a rendering or parting of one or more of the lines of the float stage in question." This was the reasonable

view to take from the evidence and we accept it as an inference justified by the facts proved. It was also shown that the Jarka Corporation was to make any repairs the floats required when they were in the slip including the purchase of whatever new lines they wanted and had authority to charge the United States Lines Operations, Inc., for the expense of them.

■ From the above, it follows that the swinging out of the float stage to cause the collision must have been due either to the use of insufficient lines or to negligence in making the lines fast. No suction greater than was to be expected when such a large ship as the Leviathan backed out of the slip was shown to have occurred. All this is prima facie proof of negligence, either in using insufficient lines or in using sufficient lines carelessly, on the part of Jarka Corporation which calls for proof in explanation sufficient to overcome it. The Trenton, 72 F.(2d) 283 (C.C.A.2); Cranberry Creek Coal Co. v. Red Star Towing & Transp. Co., 33 F.(2d) 272 (C.C.A.2); The Elizabeth M. Baker, 69 F.(2d) 54 (C. C.A.2). Such explanation was not forthcoming and the liability held established must be sustained.

■ It is urged that the Dalzelline was in collision with what was in effect an anchored vessel out of whose way she was bound to keep or be charged with fault unless there is proof that she could not by taking reasonable precautions have prevented the collision. Cf. The Gulf of Mexico (C.C.A.) 281 F. 77, 78; The Buffalo (C.C.A.) 56 F.(2d) 738. Even so, the tug was correctly exonerated because she was of necessity moving at about full speed ahead on a course that would have cleared the float stage had that not unexpectedly swung out so far and when the swing was made she could do no more than she did by promptly reversing and taking off such headway as was possible.

■ We cannot agree, however, that United States Lines Operations, Inc., is secondarily liable. The Jarka Corporation was an independent contractor in charge of the float stage. There was no evidence that the stage was not adequate and suitable in every respect for the work to which it was to be put when turned over by United States Lines Operations, Inc., for that purpose or when it was taken in charge by the Jarka Corporation whether from the owner or from United American Lines, Inc. Its condition thereafter became the

responsibility of the Jarka Corporation under its arrangement with the owner as above set forth. Thereafter the owner was bound to pay for needed repairs and renewals but the responsibility for making them was on the Jarka Corporation. As there was no proof that the latter was the agent of the owner in making repairs or renewals or that the owner was bound itself to inspect and repair, there is no sound basis for holding United States Lines Operations, Inc., liable at all.

Decree modified to dismiss the libel as to United States Lines Operations, Inc., and otherwise affirmed.