## THE BOUKER NO. 7.

District Court, S. D. New York.
May 28, 1940.

Bigham, Englar, Jones & Houston, of New York City (Andrew J. McElhinney, of New York City, of counsel), for libelant.

Foley & Martin, of New York City (Christopher E. Heckman, of New York City, of counsel), for Bouker No. 7.

GALSTON, District Judge.

On October 2, 1938, the steamtug Bouker No. 7 took in tow at Riker's Island nine scows to be towed to Port Jefferson. They were arranged in four tiers of two boats abreast in each tier, with a ninth boat tailing on the starboard side of the last tier. On the way down Long Island Sound, because of weather conditions, the tow put into Wilson's Point on the Connecticut shore and remained there until about 6:30 that afternoon. With the tow arranged in the same manner the Bouker No. 7 then proceeded across the Sound, bound for Port Jefferson, there being at that time no indication of bad weather. There was a light breeze from the north; the sky was clear and the swells had dropped down.

The trip from Wilson's Point to Port Jefferson would normally require about five hours. Allen, one of libellant's witnesses, a master mariner, in cross-examination admitted that a navigator has a reasonable chance of figuring on the weather for five hours on Long Island Sound, "with the scientific data we are supplied with now-a-days".

On leaving Wilson's Point about 15 fathom of hawser ran from tug to head scow. Walsh said that that was a good controlling length for keeping the tow under full control at all times, particularly going into Port Jefferson between the breakwaters. It should be observed that the tow was light. On the way over from Green's Ledge to Port Jefferson they passed two or three sand tows which were going towards New York. Somewhere east of Eaton's Neck the wind came up with great force from the east, reaching 40 miles an hour and creating a considerable sea. At that time the tow was about 4 or 4½ miles east of Eaton's Neck on a course east southeast. The course was the shortest between Green's Ledge and Port Jefferson. Walsh said that the only possible point of refuge was Crane's Neck. Though other harbors, such as Wilson's Point and Huntington Bay, were closer, it would have been impossible to make them, for to maneuver the tow around and put the tow in the trough of the sea would have exposed the scows to great punishment. Bridgeport was equally unavailable because of the difficulty of navigation. Therefore, as a matter of mariner's choice, Walsh proceeded ahead into the wind and the sea, changing his course from east southeast

586

to east. Before the wind struck, the engines had been operating at full speed and no change was made at the time the course was changed. The effect of reducing the speed would have caused the scows to bring up together. In consequence he kept going full speed ahead. The force of wind and sea was so great that at times they made no headway. Indeed, said Walsh, they made sternway. After an hour of thus battling wind and sea the port hawser parted with the consequent damage. Then he caused a lead line to be cast to the scowmen, stopped the tug and succeeded in getting the hawser out and thereupon proceeded towards Port Jefferson, keeping head to the wind. They edged over somewhat at times half a point, sometimes a point. Walsh hoped to get back of Crane's Neck but did not succeed, and kept on in that way, reaching Port Jefferson the next morning.

The faults ascribed by the libelant relate more particularly to the length of hawser and failure to seek shelter either by returning to Wilson's Point or turning into Huntington Bay. The libellant also urges that the parting of the hawser made out a prima facie case of negligence against the tug. The Elizabeth M. Baker, 2 Cir., 69 F.2d 54; Dalzelline, 2 Cir., 89 F.2d 160; Cranberry Creek Coal Co. v. Red Star Towing & Transportation Co., 2 Cir., 33 F.2d 272.

A sample of the hawser was submitted by the claimant to the Columbian Rope Company and was found to be in good condition. The rope under test did not part until a pressure of 41,200 pounds had been applied, which compares favorably with the breaking strain for a new rope of 7″ manila hawser as fixed by the government specification at 41,000 pounds. Claimant established that the hawser was purchased on July 14, 1938, and that between that date and October 2, 1938, there were periods of time during which the Bouker No. 7 was not in operation. Walsh testified that the two 7″ hawsers were good rope—"They weren't fully dirtied up as they would be after being used say twenty times, twenty or twenty-five times". Nor can unfavorable inference be drawn from the failure complained of at the trial to produce the hawser. The claimant with considerable force points to the fact that the demand comes very late. The libel was not filed until August, 1939, more than ten months after the damage occurred, and

libellant could have requested an inspection of the hawser at any time before suit was begun.

It would appear that the perilous weather conditions which prevailed at the time were a sufficient explanation of the parting of the hawser.

There certainly was no fault in leaving Wilson's Point at that time. The assumption was justified that the trip could be made without encountering adverse weather conditions. Indeed, one of the Seaboard witnesses said that they were out two and a half hours before the wind came up from the northeast. The tugmen place the coming up of the wind a half hour later.

Nor from the evidence in the case can one conclude that it was improper to play out only 15 fathoms of hawser from the tug to the head scows. There was some difference of opinion on this question, but on the whole the expert witnesses called by the claimant establish the inference that that length of hawser in towing light boats to Port Jefferson is sound practice. Nor was there any negligence proved in the conduct of the tow after adverse conditions were encountered. Walsh made a mariner's choice and there was no showing of flagrant error on his part. He gave good reasons for not returning to Wilson's Point or seeking refuge in Huntington Bay, as well as for failure to go to Bridgeport. The Imoan, 2 Cir., 67 F.2d 603; Eastern Tar Products Corporation v. Chesapeake Oil Transport Co., 4 Cir., 101 F.2d 30. Disinterested witnesses agreed with Walsh that he was justified in keeping on towards Port Jefferson. Pederson, who was out in the storm that night, when asked as to the advisability of turning the tow, said: "I am sure he would not have reached the Point, Eaton's Neck or Huntington Bay before they would have passed up on him going into the trough of the sea, which he would have done going from this mark here into Eaton's Neck. He would not have had a following sea at all. He would have had a side sea."

Nor was there an error in failure to lengthen hawsers. Walsh had to decide, since he was going to Port Jefferson, between possible damage through failing to lengthen, and almost certain damage if he did so in entering the narrow Port Jefferson breakwater.

From all that appears, the damage is attributable not to any fault or negligence of the tug, but solely to the unexpected

weather conditions. The Herkimer, 2 Cir., 52 F.2d 41; In re Owen McCaffrey's Sons, 2 Cir., 20 F.2d 728.

The libel will be dismissed. Submit findings of fact and conclusions of law in conformity with the foregoing opinion.