CRANBERRY CREEK COAL CO. v. RED STAR TOWING & TRANSP. CO., and four other cases.

Circuit Court of Appeals, Second Circuit. June 10, 1929.

Nos. 298–302.

Barry, Wainwright, Thacher & Symmers, of New York City (Earle Farwell, of New York City, of counsel), for the Wessels.

William J. Mahar, of New York City, for the Liberty and the Cranberry Creek Coal Co.

Macklin, Brown, Lenahan & Speer, of New York City (J. Dudley Eggleston, of New York City, of counsel), for the Harry Howard, the Rita Howard, and the Irvington.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark and P. Fearson Shortridge, both of New York City, of counsel), for the tug.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

· L. HAND, Circuit Judge (after stating the facts as above). ▮ As in collision, so in towing, a vessel does not, of course, become liable for all damage arising from her navigation or unfitness; she is not an insurer, and the injured party must establish some fault through neglect or affirmative misconduct. But there are situations in which the law does not put the duty upon the sufferer to make proof at the outset; either because the facts are especially within the owner's knowledge, or, as in the case of collisions with an anchored vessel, because usually there must be some fault, it is thought just to require the owner to explain, and if he does not, to charge him. A failure of machinery or gear is within this class of cases and the owner's duty is often spoken of as the defense of "inevitable accident." Strictly, it is no defense at all, but a true presumption; that is to say, a duty laid upon him to supply proof which casts him if he fails.

This duty extends not only to disclosing what happened, but what was done to avoid, and what would have been necessary to prevent it. After he has done so, no doubt the burden remains upon the injured party to show that the necessary care was not beyond what the law exacts, but the owner is in no position to demand consideration of that question until he has made his proof. We have enforced this rule under a variety of circumstances (The J. Rich Steers (C. C. A.) 288 F. 319; In Re Reichert Towing Line (C. C. A.) 251 F. 214; The Westchester (C. C. A.) 254 F. 576; The Columbia (C. C. A.) 255 F. 515); and it is not at all peculiar to us (The Olympia, 61 F. 120, 122, 123 (C. C. A. 6); The City of Camden, 292 F. 93 (C. C. A. 3); The Merchant Prince, [1892] Prob. Div. 179 (C. A.). It makes no difference whether the case involves a collision, towage, or, for example, the local statute against dumping refuse in New York Harbor.

In the case at bar the respondent showed nothing at all as to what it had done to provide a seaworthy stud. The tug was 25 years old at the time, and, so far as appeared, the stud may have been in continuous use all the time. When she was overhauled shortly before the break, nothing was done to ascertain that it was still serviceable. Whether metal

degenerates with age under such circumstances we cannot tell, nor how often such a member should be examined and replaced. The reason for the break we are left to guess by inspection. It was quite immaterial that the nuts were screwed home; that would have been important only if they had worked loose. The proof stopped precisely at the critical point; it showed what the defect was, but not what was necessary to detect and provide against it. The liability was therefore established.

▮ On the other hand, the failure of the barges to let go their anchors might have been a true defense. This could not, indeed, apply to the Harry Howard, which did what she could, nor to the Liberty and the Irvington, which were the middle barges in the second and third tiers and could not let go their anchors, unless they cut adrift, which they were neither called upon to do, nor justified in doing without orders. It was important only as to the Rita Howard and the Wessels. As to the first the argument is that the bargee should have heaved her anchor over the starboard rail so as to clear the Harry Howard, made fast close ahead. . As we think that no adequate orders were given in any case, and as that is an answer both as to her and to the Wessels, we pass the possibility that she could have let go her anchor in this fashion.

That some order was given is proved by the conduct of the Harry Howard, and is indeed conceded. When the tug first became helpless her master went aft and, as he says, shouted to the bargees in general to get their anchors ready. The bargee of the Harry Howard did so, but those on the Wessels and the Rita Howard did not understand that the order was for them, and indeed the tug's master was not clear as to just what he did say, though apparently he saw all the bargees who had been aroused by the accident. He then went forward to blow his whistle and later returned aft two or three times, at one of which he gave a similarly indefinite order to let go. His confusion was such that he failed to drop even his own anchor, though in some way he managed to make off to starboard and escape injury.

It must at any rate have been clear to him that the order, if given to all the bargees, or to those in the hawser tier, had not been so understood. Near to half an hour passed between the accident and the collision, during which there was nothing to do but blow distress signals and drop anchor. Had the time been short, had the weather been bad or the distance great, we could see a possible

excuse, but why it was impossible on a quiet day to communicate over a distance less than two hundred feet is not explained. At least the defense was not made out.

The tug argues, however, that the bargees should have known enough themselves to drop anchor. Certainly this was untrue of the Rita Howard, whose position made such action difficult and possibly dangerous. More can be said for the fault of the Wessels, but in our judgment not enough. The tow was still under the tug's command, and the bargees were bound to follow her orders. The Margaret, 94 U. S. 494, 496, 24 L. Ed. 146; The Inca, 148 F. 363, 365 (C. C. A. 5). The Wessels' bargee might have divined the master's purpose or he might not. It was at least conceivable that he meant to swing the flotilla to starboard through the drag of the Harry Howard's anchor, and his own if he let it go. In any event the bargee was not called upon to act independently until the tug had plainly surrendered control, and the relation between them had thus ended. Bargees are at best a feckless folk, not to be intrusted with initiative while the tug is in charge. Indeed, it is not at all clear that two anchors would have held better than one, though that we do not press.

The Cranberry Creek Company in its libel joined the Wessels in rem and her owner and the Marine Company in personam. The value of the tug is apparently enough to answer the claims of all the libelants, and, as the Wessels would in any case be only secondarily liable, the suit as to her becomes moot. The question involved turns upon whether the Harter Act applies to a vessel navigating between Perth Amboy, N. J., and Great Neck, Long Island, a question of some importance, which we do not wish to decide, unless it becomes necessary. At the present time it is not, and we shall therefore dismiss the libel against the Wessels and her owner without prejudice to its revival in the District Court, should the value of the tug prove inadequate to meet all the claims.

The decrees dismissing the libels against the Marine Company and granting relief against the Wessels and her owner are reversed, and the causes are remanded. The Cranberry Creek Company will take an interlocutory decree against the Marine Company; its libel against the Wessels and her owner will be dismissed without prejudice to its revival in the District Court, should the value of the tug prove inadequate to meet all the claims. The libelant Loughlin will take an interlocutory decree in personam against the Marine Company. The other libelants will take interlocutory decrees against the tug in rem and the Marine Company in personam.