## THE CASTLETON.

### UNITED STATES GYPSUM CO. v. McWILLIAMS et al.

### No. 200.

Circuit Court of Appeals, Second Circuit.
April 3, 1933.

**12**

Purdy & Purdy, of New York City (William F. Purdy and Frank C. Mason, both of New York City, of counsel), for claimant-appellant.

Barry, Wainwright, Thacher & Symmers, of New York City (Earle Farwell, of New York City, of counsel), for respondent-impleaded appellee.

Horace M. Gray, of New York City, for libelant-appellee.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

The covered barge Castleton was chartered to the United States Gypsum Transportation Company under an oral charter, later confirmed by letter, which provided in the usual manner in New York Harbor that the owner would provide and pay the bargee who accompanied the boat. Payment at a stipulated rate per day was agreed to with the provision that, if overtime pay for the bargee became necessary, the owner would be reimbursed for that by the charterer. There was no payment for overtime, however. The charterer was a subsidiary of the libelant.

The libelant loaded a cargo of 390 tons of plaster on the Castleton at its plant on Staten Island for which the bargee signed a bill of lading for transportation to the pier at 135th street and East River.

The barge was seaworthy and the load was within its capacity and well trimmed to give the boat an even keel. She was towed to des-tination and berthed at the pier about 1:30 a. m. November 6, 1928. As loaded, she drew from seven to eight feet of water. The tide was then too low to permit her going alongside the bulkhead. About 6 o'clock in the morning, the tide having risen sufficiently, the bargee hauled her up to the bulkhead and made her fast. As that was election day, no work was done but the bargee remained aboard and tended his lines. The boat rode the low tide with slack lines that afternoon without incident by merely going aground with a slight list offshore. The bottom was black river mud, and this boat as well as the Balsam, a barge a few feet longer and a few inches narrower, had within the two months just previous often lain safely at this berth with similar loads through changes in the tide. There was some evidence that bags of plaster thrown overboard from previous loads had made this a foul berth, but the District Court found that such plaster, even if it had hardened before being thrown into the water, would there soon become soft, and that no dumping of plaster as claimed had made the berth foul.

At about 6 p. m., November 6th the wife and two children of the bargee went ashore to spend the night. He remained on board until about 11 p. m. when he also went ashore to get the election returns and to get something to eat. At that time the barge was made fast with two breast lines, one to each of the offshore corners; and two spring lines, one to each of the inshore corners. This was the customary method, and the lines were all slack. The tide was then falling. About midnight, the bargee returned and found that the boat had taken the ground some five or six feet from the bulkhead. He could neither pull it in nor get on board with the ladder he had used to go ashore. His lines were still slack enough to hang in the water, and he could slack them no more without going aboard. He then left and returned early in the morning to find that the barge had overturned and dumped its cargo. Three of the lines were broken. Her stern breast line alone still held. She then lay with her bow some thirty feet out from the bulkhead and her stern farther offshore. The tide at this place has a normal fall of about six feet, and on this night the fall was greater than it had been since the previous May. It was 22.8 inches below mean low water according to the tidal gauge at Ward's Island, and such a fall is somewhat unusual. Upon this state of facts, the District Court reached the conclusion that the bargee's negligence in failing to

provide enough slack in his lines when he left his boat was the cause of her dumping her cargo. This finds support in the fact that this boat had frequently remained safely at this berth through the rise and fall of tides when lines had been properly tended. On this record, we are not prepared to say that the District Court incorrectly interpreted the facts in finding that the bargee was negligent in tending lines that he did not change after 9:30 that night. It is, indeed, rather difficult to understand how her short lines could have caused the dumping of her cargo when she was resting on a soft mud bottom that gave her but a slight list offshore. Yet the evidence as to the slope of the bottom but a little further offshore is not satisfactory, and it well may be that she hung on her lines until they snapped and let her slide in such a way that a sudden shifting of her load brought disaster. At any rate, the probabilities are with the District Court on this question of fact, and we accordingly accept its determination that the cause of the dumping of the cargo was the negligence of the bargee in failing to tend his lines.

The responsibility for this negligence is that of the barge, since the bargee was furnished and paid by the barge owner. It was his duty to the cargo to tend his lines without being negligent. Dailey v. Carroll (C. C. A.) 248 F. 466; C. F. Harms Co. v. Turner Const. Co. (C. C. A.) 3 F.(2d) 591. See, also, Id. (D. C.) 290 F. 612. As no negligence on the part of the charterer was shown and the owner was not privy to the contract of carriage, they were not liable in personam, and the libel as to them was properly dismissed.

Decree affirmed.