## THE C. W. PATTERSON.
## THE HARRY F. KEELER.
### No. 389.

Circuit Court of Appeals, Second Circuit.

May 14, 1934.

Bigham, Englar, Jones & Houston, of New York City (Leonard J. Matteson and Richard F. Shaw, both of New York City, of counsel), for defendant.

Purdy & Purdy, of New York City (Edmund F. Lamb, of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

On May 1, 1932, the tug, "Harry F. Keeler," with two sea-going barges in tow, was steaming east in Block Island Sound a little beyond Watch Hill. The first boat was the libellant's barge "Patterson" on a hawser of one hundred and fifty fathoms, followed by the "Annie," at a like interval. The weather was becoming thicker and the tug concluded, wisely as all now agree, to turn about, and make for New London Harbor, the nearest shelter. To do she had to go along the outside of Fisher's Island and then turn north around Race Rock Light. The tug was off the light at about 5:30 p. m. and could at that time make it out, though it was obscured by occasional patches of fog; she passed it about a quarter of a mile off on her starboard hand, after which the fog set in so thick that she could see nothing more. The flood, whose course in the middle of Fisher's Island Sound is west, was at full strength, but apparently weak for those waters (the Coast Pilot puts its ordinary strength at over three miles, p. 57). The wind was from the southwest, probably about twenty miles an hour, and the master thought that it would about offset the tide, though the assumption seems somewhat strained. In any case he acted upon it and for about a mile steamed north, magnetic, after which he shifted to north by west, which he held till he went ashore. These two courses would have brought him a little to the west of the entrance of the five fathom channel leading into the harbor, had there been no set to the west; but in fact he had miscalculated the force of the tide which the wind did not balance. The tug and the "Patterson" went aground close to shore about half a mile to the westward of where he supposed he was, and the "Annie" followed suit, much further off the course. All fog signals to leeward of the tow were muffled by the wind; the tow passed none to windward. On these facts the judge thought that the tug had done as well as possible; that she could not have known what would be the resultant of the two forces to which she was subject; nor could she have anchored in the Sound. There was no alternative but to press on and try to make the harbor; this she did with every reasonable precaution. Therefore he dismissed the libel.

We accept the findings of fact, but the proper standard of care is a question of law. Even so the case is a close one, and we will assume for argument, though we do not decide, that it would be too severe a standard to demand a more accurate estimate of the resultant between wind and tide; much latitude ought to be allowed to a master who could get no bearings by eye or ear. The Eastern, 280 F. 711 (C. C. A. 2); The Alice Moran, 67 F. (2d) 603 (C. C. A. 2). But we cannot agree as to the failure properly to use the lead.

There was a deck-hand forward who was heaving it regularly, and who reported water enough until somewhat suddenly he found only twenty-five and then twenty-two feet. At this the tug stopped and signalled the barges to anchor; they did not hear; the Patterson kept on until she overhauled the tug, and both went aground close beside each other. For some wholly unexplained cause, the "Annie" must have drifted far off to the westward, for she went ashore before either of the others, parting her hawser when she did. We can account for her position only on the theory that as the tug came closer to shore the tide slackened and the "Annie," which was over a third of a mile behind, remained in the faster current. But if this is true, it is still a mystery why the "Patterson" remained in line. The course of the tug we can plot with reasonable certainty; for she did not change her helm and we know where she fetched up. In covering a little over three miles she had slipped nearly three-quarters of a mile to the west of the projected course; she must have passed Sarah's Ledge on her starboard hand, which, being her lee, probably accounted for her failure to hear the siren. If so, she began to have less than five fathoms of water almost as soon as that buoy was abeam, and from there on it grew constantly shallower. A five fathom contour drawn on the chart shows a shelf projecting for more than half a mile along her course from the spot where both she and the "Patterson" fetched up; a four fathom shelf for about three-eighths of a mile. At four miles an hour, the speed she says she had, she would therefore have been for more than seven minutes in less than thirty feet of water and for about six in less than twenty-four. Yet she did not reduce or take any other action until she was substantially ashore herself and until after the "Annie" had actually struck. We cannot agree that this was compatible with proper care. The lead was her eyes and ears; if cast every two minutes, there would have been six or seven casts in less than five fathoms before she went aground, and each ought to have been notice of danger. On the course she had laid, some change of helm was necessary to make the harbor; otherwise she would take the ground east of Southwest Ledge, if the wind overbalanced the tide, or on Osprey or Ocean Beach, or still further west, if the tide was the stronger. In any case she was bound to be on the watch for the spot at which to make that change, and the lead would have told her, had she used it properly. To press on without change, in the face of the warnings

with which we must charge her, was to run into certain disaster.

Decree reversed; interlocutory decree for the libellant.