## THE TRENTON.

### THE PRIDE.

### THE P. R. R. NO. 231.

### THE LOYAL.

## FULTON LIGHTERAGE CO. v. ERIE R. CO.

### Nos. 350–352.

Circuit Court of Appeals, Second Circuit.
July 16, 1934.

Single, Atkins & Tyler, of New York City (Christopher E. Heckman, of New York City, of counsel), for libelants-appellees.

Lynch & Hagen, of New York City (Anthony V. Lynch, Jr., and Henry C. Eidenbach, both of New York City, of counsel), for Erie R. Co.

Purdy & Purdy, of New York City (Edmond F. Lamb, of New York City, of counsel), for Fulton Lighterage Co.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark and Adrian J. O'Kane, both of New York City, of counsel), for Pennsylvania R. Co.

Emery & Pyne, of New York City (Warner Pyne, of New York City, of counsel), for Lehigh Valley R. Co.

Before MANTON, SWAN, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

These three actions were heard in the District Court together with two others not involved in this appeal, and one opinion will suffice here. The controversies grew out of damage sustained by the boats of the libelants in the slip on the north side of Pier 2, Bush Docks, Brooklyn, during the night of April 1, 1929.

So far as now material, the positions, just before the trouble, of the injured boats relative to the pier, to each other, and to a steamer in the slip, were as follows: One scow and eight barges and lighters were tied up in three tiers of three boats each alongside the north edge of the pier. The first tier was some distance inside the pier end, probably about 50 feet, and consisted of the scow Jersey Central No. 212 made fast to the pier, the lighter Loyal, stern in, just outside and made fast to the No. 212 by bow and stern lines made up of four parts of nearly new 5½″ hawser, and the lighter Trenton light, outside the Loyal, stern out made fast to the Loyal by a line from her bow to the stern of the Loyal and a line from her stern to the Loyal's bow. The Loyal was so moored about 3 p. m. in the afternoon of April 1st and the Trenton somewhat later that afternoon. When the Trenton was moored, no examination of the Loyal's lines was made.

The second tier, some 40 feet inshore from the first, was made up of the barge Kingston fast to the pier, the Standard Oil lighter No. 110 fast to and outside the Kingston, and the lighter P. R. R. No. 231 bow out fast to and outside the Standard Oil lighter. The third tier was still farther inshore; the second tier being about midway between it and the first. In the third tier were the lighter Dakota fast to the pier, the lighter Dexter outside of and fast to the Dakota, and the lighter Pride bow in and fast to the Dexter was the outside boat in this tier. Inshore of these three tiers, lying bow in alongside the north edge of the pier, was a steamer whose name and dimensions are not given. There were other boats in the slip, but their presence and position are not now of any importance.

About 5 p. m. that afternoon the captains of the Loyal, the Standard Oil No. 110, the P. R. R. No. 231, the Pride, and perhaps the captains of some of the other boats, went ashore for the night. Soon after noon, southwest storm warnings had been put out by the Weather Bureau, and until evening the wind, continuing to blow from that quarter, was high, but the boats at this pier were safe enough, as they were protected from such a wind by the pier sheds some 60 feet high. Between 7 and 8 in the evening, however, there was an abrupt change in the direction of the wind to northwest, and it increased in velocity until by 10 o'clock it was at gale force and continued to blow for some time at 72 miles per hour as shown by the three-cup anemometer at the Weather Bureau. Then the pier sheds no longer acted as a wind break for the boats in the slip. A four-cup anemometer would have recorded it as a 94 mile wind, which is nearly as high as any ever recorded in New York.

During this gale, some time between 10 and 11 p. m., the mast of the Loyal broke off about 5 feet above her deck, and in falling did some damage to the Kingston. Shortly afterward the Loyal parted her bow fast to the No. 212 and drifted, of course with the Trenton, across the slip to a position broadside to the wind, where she hung for a time on the line from her stern to the No. 212. Then this line gave away, and the two boats drifted up farther into the slip, hitting some of the other boats in so doing. What happened then is rather confused and lacking in detail. At any rate, it was soon noticed that the No. 231 also had broken her moorings. She drifted against the Pride, doing considerable damage both to herself and to that boat, before she was shifted by the tug Slatington about 2:45 the next morning back to her

berth outside the No. 110, where she was made fast by the same lines with which she had been originally tied up.

As a result of these occurrences, Charles W. Peterson, the owner of the Pride, sued the Lehigh Valley Railroad Company, which had that boat under charter from the owner, the lighter P. R. R. No. 231, and her owner, the Pennsylvania Railroad Company. The libel against the Lehigh Valley Railroad Company was dismissed, and a decree was entered against the No. 231 and her owners from which an appeal was taken. The Fulton Lighterage Company, owner of the Trenton, sued the Erie Railroad Company, its charterer, and has appealed from a decree dismissing its libel. Bernhard A. and N. Fedde, owners of the Loyal, filed their libel against the Trenton and her charterer, the Lehigh Valley. The Fulton Lighterage Company appeared as claimant and impleaded the Erie Railroad Company. The petition impleading the Erie was dismissed, and so was the libel against the Lehigh, but a decree was entered against the Trenton and her claimant, and the appeal from that decree is the third involved herein.

[1, 2] In the suit of Peterson, owner of the Pride, against the No. 231 and her owner, it was undisputed that the damage was done by the collision of the drifting No. 231 against the Pride, a moored vessel. This fact made out a prima facie case in behalf of the libelant against the No. 231. The Buffalo, 56 F.(2d) 738 (C. C. A. 2). In its effort to prove that the No. 231 was the victim of an inevitable accident in breaking adrift, its owner has, as is entirely proper, made much of the exceedingly high wind which was blowing at the time, but it has failed to overcome the prima facie case against it, since it failed to prove either that the boat was adequately moored or that, being made fast with due care, she broke away because the Loyal and Trenton drifted against her. There was no evidence as to the sufficiency of her lines except what may be inferred from the fact that they were used to secure her when the Slatington returned her to her berth after the severity of the storm had abated. Other boats in the immediate vicinity whose lines were tended during the storm remained fast. While the storm was unusually severe the maximum velocity of the wind was maintained but for a short period, and it is idle to urge us to reverse the trial judge for his failure to sustain the defense of inevitable accident when there was a failure to show adequate mooring in the first instance and a failure to show that the boat was given any attention whatever during the storm. The D. L. & W. No. 442 (C. C. A.) 30 F.(2d) 250. Failure to overset the prima facie case with evidence to show that the drifting of the No. 231 was due to inevitable accident was tantamount to a failure to excuse by a legally sufficient explanation the collision of the No. 231 with the Pride. Cranberry Creek Coal Co. v. Red Star Towing & Transp. Co. (C. C. A.) 33 F.(2d) 272; The J. Rich Steers (C. C. A.) 228 F. 319; In re Reichert Towing Co. (C. C. A.) 251 F. 214; The City of Camden (C. C. A.) 292 F. 93. See also, the Herm (C. C. A.) 267 F. 373.

The libel against the Lehigh Valley Railroad Company, as the charterer of the Pride, was properly dismissed as the charter expressly provided that the return of the boat in a damaged condition should not create any liability on the part of the charterer unless negligence was proved, and there was no such proof. So the decree in the Peterson Case is affirmed.

Additional pertinent facts relating to the action of Fulton Lighterage Company, owner of the Trenton, against the Erie Railroad Company, charterer of the Trenton, and to the action of Fedde et al., owners of the Loyal, against the Lehigh Valley Railroad Company, charterer of the Loyal, against the Trenton, Fulton Lighterage Company, claimant, and the Erie Railroad Company, impleaded respondent, show the Trenton had been sent to the north side of the pier with a crated automobile to be put aboard a steamer there. About half past 3 in the afternoon she was shifted by a tug owned or operated by the Bush Docks to her berth outside the Loyal. Though no examination of the Loyal's lines was then made, there is no doubt that, when the Trenton was moored to the Loyal, she was given a safe berth under conditions then prevailing, and that her berth continued safe, at least until the wind changed in direction and velocity between 7 and 8 o'clock in the evening. From then until these two boats broke away between 10 and 11 o'clock they were in danger, but nothing was done to protect them either by shifting them to a better protected position or by increasing their lines. When the captain of the Loyal left his boat for the night at about 5 o'clock in the afternoon, he knew that the Trenton was moored alongside. While the Trenton was bound to know the condition of the fasts of the Loyal and not overcharge them, Penn. R. R. Co. v. McWilliams (C. C. A.) 277 F. 798, the Loyal by accepting the added burden to her fasts might be charged

with the duty by acquiescence in the situation of taking steps which were reasonably necessary and reasonably within her power to prevent injury due to the mooring of the Trenton to her. Osterhoudt v. Federal Sugar Refining Company (C. C. A.) 22 F.(2d) 475. However, this duty which arises under a theory akin to that implicit in the doctrine of last clear chance did not excuse the Trenton for failure to use due care to see to it that, when conditions changed because of the storm, her hanging upon the Loyal's lines did not cause them to part; and such changed conditions did not charge the Loyal with any duty to act until it was evident that the Trenton was failing to take the precautions which were primarily hers to take. Nor was there any obligation upon the Loyal to maintain a watch to determine whether the Trenton would be derelict in her duty. Consequently, the Loyal was guilty of no fault. The Trenton, however, failed to discharge her duty to put out lines, when the storm became dangerously severe, to prevent overcharging the fasts of the Loyal, and has not excused her failure to act. So her liability in rem for the damage to the Loyal was established.

[6-8] The Erie Railroad Company which had the custody and control of the Trenton under a demise charter was responsible for her being moored to the Loyal, though the actual shifting was done by a Bush Docks tug since that tug had the implied authority of the charterer to shift the boat in the slip. Nicholson v. Erie (C. C. A.) 255 F. 54. Yet, as between the owner and the charterer of the Trenton, the owner is liable for any damage caused not only to the Trenton, but by the Trenton, because of the negligence of her master in caring for her after she was moored. Dailey et al. v. Carroll et al. (C. C. A.) 248 F. 466. This does not, however, prevent the owners of the Loyal, who are third parties, from holding either the charterer of the Trenton or the charterer of the Loyal or both, for any damage done to the Loyal by reason of their negligence. The trial judge found, however, that the cause of the drifting of the Trenton and the Loyal was the negligent failure of the Trenton's master to put out additional lines when the storm made that necessary. As we accept this as the fact, together with the additional findings to the effect that neither of the charterers were negligent, it follows that they are not liable.

Decree modified in accordance with the views expressed in this opinion, and otherwise affirmed.