## THE LIZZIE D. SHAW.

### INTERNATIONAL SALT CO., Inc., v. DIAMOND P. TRANSP. CO.

#### No. A-14256.

District Court, E. D. New York.

July 3, 1936.

Bigham, Englar, Jones & Houston, of New York City (Richard F. Shaw, of New York City, of counsel), for libelant.

Crawford & Sprague, of New York City, and Conlen, La Brum & Beechwood, of Philadelphia, Pa. (George C. Sprague and Roy W. Chamberlain, both of New York City, and George E. Beechwood and James S. Benn, Jr., both of Philadelphia, Pa., of counsel), for Diamond P. Transp. Co.

Lewis, Wolff & Gourlay, of Philadelphia, Pa., and Duncan & Mount, of New York City (Otto Wolff, of Philadelphia, Pa., of counsel), for the Lizzie D. Shaw and her claimant.

BYERS, District Judge.

In this cause the libelant seeks to hold the Diamond P. Transportation Company in personam and the tug Lizzie D. Shaw in rem for the loss of 1009 tons of No. 2 rock salt laden on the barge Rob Roy as to which there was a total loss; and for water damage to 500 tons of the same commodity laden on the barge Howard E.

The facts are simple and with few exceptions are not in dispute.

These cargoes were laden at Columbia Street, Brooklyn by direct discharge from the motor vessels I. L. I. 102 and 103, respectively, on September 30 and October 2, 1933. Transportation had been from Detroit in the motor vessels, and the destination was Carney's Point, N. J.

The barges were moved to Red Hook Flats, and there the tow was made up and the voyage begun on October 4th at about 4:00 a. m. The Rob Roy was the lead barge and only these two were in the tow.

Short hawsers were taken until the Narrows had been passed, when they were paid out to 150 fathoms as to each hawser.

The wind was from the east to northeast at a velocity of from 15 to 20 miles per hour, and no storm warnings or rough sea have been shown.

Scotland Light was passed on the port hand at from one-eighth to one-half mile at about 7:30 a. m. The course was then changed for the run down the Jersey coast to west by south, and the tow proceeded at a distance of from three to five miles offshore.

At about 11:00 a. m. the Rob Roy began to take in more than the customary amount of water; her captain said she began to

leak, and he signaled the tug, by use of a mechanical horn, so to indicate. His pumps were working and able to take care of the water so made; at about 1:30 p. m. one of his pumps became choked with salt and he could not clear it; he again signaled in the same way, but there was no indication that the tug made out the signal. At about 3:00 to 3:30 o'clock the other pump similarly clogged and the barge was thus rendered incapable of clearing herself of the water which was coming into the hold from below. The captain went down to investigate but could not see where the water was entering; he thought she must have opened a seam because she was tight, he said, when the voyage started. He also tried to clear the pumps, but failed.

The barge again signaled the tug, by sounding 7 short blasts on the horn, but again no attention was paid. Then the captain flew a distress signal forward, and presently the tug came about into the wind and approached the barge.

The barge captain got an axe and indicated his intention to cut the hawser leading to the tug; he then cast it loose, and he and his crew (two other men) got into the lifeboat which had been lowered and made fast astern, and the three made their way to the tug, in its lee.

At this time the barge captain said that seas were boarding his vessel as she lay in the trough and that she was sinking. He considered that she would sink at least by midnight, and was unwilling to risk his own life or that of his companions by staying on board after dark. Before leaving his vessel, he cast off the hawser to the Howard E. and also put over an anchor with 60 fathoms of chain.

His vessel sank at about 5:00 a. m., as estimated, of October 5th, after the tug had proceeded back to New York with the Howard E., where safe arrival was had inside Sandy Hook at about 1:00 o'clock in the morning. The 500 tons of salt on the latter barge suffered some water damage due to leakage on the return trip. These are the circumstances giving rise to the litigation.

The pertinent facts will be developed somewhat more in detail in connection with the various arguments which have been adduced.

For the owner of the barges, it is urged, first, that there can be no recovery against it, because there were no contractual rela-

tions between the libelant and the Transportation Company; second, that the barges were shown to have been seaworthy on breaking ground; and finally, that the tug was guilty of neglect in acquiescing in the abandonment of the Rob Roy without making any effort to ascertain or correct the conditions said to have existed on board, or to tow her to a port of refuge.

The tug argues that unseaworthiness of both barges has been shown, and that she was without fault.

The libelant relies upon the unseaworthiness of the barges and the same faults which are attributed to the tug by the owner of the barges.

It will be convenient to examine the question first above stated with reference to the libelant's right to proceed in personam against the owner of the barges.

In this connection, the libel alleges that the said cargo was delivered to the respondent in good order and condition from the said motorships "to be transported by respondent from Columbia Street, Brooklyn, to Carney's Point, New Jersey, in consideration of an agreed freight, and there to be delivered to libellant or order in the same good order and condition as when shipped * * * That respondent, in violation of its obligation as bailee for hire to safely transport" failed to make delivery, wholly as to so much of the cargo as was laden on the Rob Roy, and only in a damaged condition as to the balance on the Howard E.

There is no allegation of unseaworthiness of the barges.

The facts are that shipment of the salt from Detroit to Carney's Point, N. J., was contracted for between libelant and National Motorship Corporation, but the contract is not in evidence; the latter corporation arranged with James Hughes, Inc., to provide transportation from New York City to destination.

The respondent pleads in its answer that these cargoes were loaded on these barges "in accordance with an oral contract of carriage between Diamond P. Transportation Company and James Hughes, Inc. * * *."

No attempt has been made to prove the terms of that contract.

It is not disputed that a warranty of seaworthiness is implied on the part of respondent to Hughes, but it is said that the libelant may not rely upon an alleged

breach of it, in asserting the failure of the respondent to perform its duties as bailee.

The libelant urges that the cargo owner may recover for breach of the implied contract of seaworthiness between the respondent and Hughes. New Jersey Steam Navigation Co. v. Merchants' Bank, 6 How. (47 U.S.) 344, at page 381, 12 L.Ed. 465; Davis v. Dittmar (The Edmont) (C.C.A.) 6 F.(2d) 141, 142.

The respondent cites The Castleton (C. C.A.) 64 F.(2d) 11, 13, and Northern No. 29 (D.C.) 15 F.Supp. 543, 1936 A.M.C. 347, to sustain the view that, since the libelant is not seeking to hold the barges in rem, and had no contract with their owner, it is without remedy in personam against the latter.

The opinion in the Northern No. 29 states that two causes in personam were pleaded by cargo against the owner where loss had occurred through the sinking of the barge and the libelant held a sub-charter of the vessel; that the one based upon contract must fail, and that the other "apparently in tort" for the negligence of the barge owner arising from unseaworthiness would be sustained.

In the Castleton Case, the cargo owner libeled a barge for loss of cargo, and sought recovery in personam against the owner; the latter impleaded the charterer under oral charter such as is customary in New York harbor. The libel against the barge was sustained, because of fault on the part of the bargee in failing to tend lines. In affirming this disposition, as well as the dismissal against the owner, and the charterer, the court said: "As no negligence on the part of the charterer was shown and the owner was not privy to the contract of carriage, they were not liable in personam, and the libel as to them was properly dismissed."

The language just quoted from the opinion of the Circuit Court of Appeals is thought to be the most recent statement of that Court on the subject under discussion.

Taylor Bros. Lumber Co. v. Sunset Lighterage Co. (C.C.A.) 43 F.(2d) 700, 702, does not help. Apparently the cargo owner libeled the lighter for loss of cargo, and joined the owner in personam, who impleaded the charterer. The impleading petition was dismissed in the District Court, but the lighter and its owner were held.

On appeal, the Court said that the proof was sufficient as to unseaworthiness, but the opinion states: "On the argument the libelant admitted that no liability in personam against the owner was established in favor of the libelant. The decree in this respect is reversed." Whether the concession was based upon the state of the evidence, or the rule of law deemed to apply, does not appear.

In the New Jersey Steam Navigation Case, the contract of carriage was made by the agent of the libelant bank, and that contract was deemed adequate to support its recovery against the carrier.

In The Edmont, supra, the libelant had contracted with the charterer for a coal barge, to be staunch and strong; he later chartered the Edmont upon a similar basis. The barge was found to be unseaworthy, which was the basis of libelant's claim against the charterer; the latter impleaded the owner and recovery against it was affirmed, although the charterer was discharged in bankruptcy. The Court said, speaking of the owner's covenant to the charterer: "This latter agreement may be considered as security for Dittmar's [the charterer] obligation to the appellee Davis [the libelant]; that is, for the execution of Dittmar's covenant to the appellee Davis."

There was no privity of contract between the barge owner and the libelant, the cargo owner, and yet the express contract between these parties was held to operate for the benefit of the cargo owner.

The decisions cited do not resolve the issue so clearly as to point inevitably to the course which must be followed here.

■ The failure of the libelant to assert unseaworthiness on the part of the barges, and its willingness to confine its cause to a claim in personam against the owner, necessarily confines the questions for decision on this branch of the cause, to a narrow compass. It is considered that the libelant has not demonstrated privity to the implied contract of seaworthiness running in favor of James Hughes, Inc.

It would be quite acceptable to come to a contrary view as a matter of expediency, because inevitably that issue of seaworthiness must be met. Had the cause been laid in the first instance against the National Motorship Corporation with which the libelant had its contract, it is reasonable to suppose that the charterer

would have been impleaded, and then the owner of the barges, and the different aspects of the entire controversy would have been susceptible of adjudication in one litigation. That course has not been followed, and it is thought that the intermediate rights and responsibilities cannot fairly be by-passed by the procedure which has been adopted. For failure of proof then, this libel will be dismissed as to the owner.

The libel also alleges a cause in rem against the tug, upon the theory that it was at fault for permitting the Rob Roy to sink and for proceeding out of New York harbor at all, with both barges, under the weather conditions shown.

■ As to the latter, it is found that there was no fault attributable to the tug. If every time a wind out of the north, northeast of the force shown, not accompanied by storm warnings were to be deemed to present a hazard to south-bound coastwise navigation, those who follow the sea in these parts would spend much of their time ashore.

That the election to proceed proved to be justified appears from the subsequent events here involved. The Rob Roy went down because she could not clear herself of water that entered her hold through her seams. The Howard E. took in water similarly on her return to New York. Perhaps more should not be said until it becomes necessary to decide the issue of unseaworthiness.

These barges were of the schooner type. The Howard E. (age not stated) was 200 feet long, and 23½ feet in beam, with 12-foot sides. The Rob Roy (built in 1906) was 160 feet long and had a beam of 30 feet.

A full load for the former was 800 tons, and on this trip she carried 500 tons.

The cargo capacity of the Rob Roy seems not to be stated, but no one asserts that she was overloaded.

The immediately antecedent history of these barges is not shown as to the trips they had made, or the nature and size of the cargoes carried. They were inspected for Hughes, the charterer, when light, and were found then to have 11-foot sides. Only the inshore sides were inspected as to seams and butts. As to each barge, dirt was found in the holds and ordered to be removed. An opening in the ceiling was discovered on the Rob Roy and the bargee

was ordered to cover this with a wooden batten to be nailed in place, to prevent seepage of the rock salt into the bilges.

The barge captain was not asked if he followed that instruction, and the inspector's testimony may or may not mean that he saw the batten put into place as he required. The form of the question put to him robs the answer of value.

The other specifications of fault on the part of the tug, as set forth in the libel are:

(a) Failure to heed signals from the barge "that they required assistance." No evidence sustains this. The signals prior to 3:00 o'clock were to advise of the leaking, but until the second pump failed to function, the incoming water was not gaining.

If the barge captain had testified that he signaled for assistance at 11:00 o'clock when he noticed the leaking and started his pumps; or at 1:30 when one pump became choked, there would be a basis for the specification, but such is not the evidence.

It cannot reasonably be contended that the tug is at fault because the signal employed was not observed. That was as much the concern of the barge as of the tug. If assistance were needed, and the mechanical horn was not adequate to attract attention, a distress signal, such as was flown at 3:00 or 3:30 was needed, and the delay in having resort to it was not that of the tug.

A deck-hand was on duty aft on the tug, and he was required to act as lookout with respect to the tow. His failure to hear the horn signals is not shown to have been due to inattention.

It may well be that, if a distress signal had been displayed at 1:30, the tug would have learned of the stoppage of the first pump; it would have been the duty of the tug's captain then to ascertain if conditions reasonably required him to seek a haven.

It is considered that, as between the failure of the barge to persist in the effort to attract attention and the failure of the tug to observe the horn signals which were given, the greater and affirmative fault was of the Rob Roy.

(b) Failure to return to port when it was apparent that it was dangerous to continue on. This specification is vague and not supported by the evidence.

(c) After returning to the Rob Roy the tug failed to render assistance. This will be discussed.

(d) In that the tug abandoned the Rob Roy, and did not endeavor to tow back to New York or other port of refuge. This will be discussed.

These same specifications appear in the answer of the respondent, and additionally that after leaving Sandy Hook, the tug proceeded at an excessive rate of speed. As to this, no evidence was offered.

The criticisms of the tug come down to her alleged failure to put one or more of her own crew on the Rob Roy after her own captain refused to return to his vessel, and her failure to tow the barge back to Sandy Hook.

The testimony of Sheldon, the captain of the barge, was convincing as to his own belief at the time that his vessel would founder within a few hours, and that nothing could be done to avoid that happening. He said that during the two hours or so that intervened between his going aboard the tug and the return of the latter with the Howard E. to New York, the subject was discussed of putting an air hose on the Rob Roy in the effort to clear her pumps of the salt, so that they might be made to function, but this could not have been done, because the tug could not be held alongside for the purpose.

That of course was not conclusive upon Rose, the tug's captain, but it is persuasive evidence. Sheldon knew more about the true conditions than any one else, including counsel and the court, and his appearance and manner on the witness stand were such as to enlist confidence in his testimony.

Whether the plight of the Rob Roy could have been mitigated sufficiently, by anything in the nature of salvage operations, to admit of bringing her to a safe harbor lies entirely within the realm of conjecture.

Truly Rose was under the duty of doing something more than conduct a debate on his own vessel, and yet it is difficult to point out in any definite way that his acquiescence in Sheldon's advice was responsible for the sinking of the barge.

■ The nature of the tug's duty is not in doubt, so long as the tow was under its control. The tug was required to exercise the skill and care incident to prudent navigation. See cases cited in Henry Du Bois Sons Co. v. Pennsylvania R. Co. (The Mercer) (C.C.A.) 47 F.(2d) 172.

When the captain of the barge cast loose his hawsers, to the tug and to the Howard E., and let go his anchor, the nature and extent of the tug's duty is not so clear. In a comparable situation it has been described as partaking of salvage. The W. J. Keyser, 56 F. 731 (C.C.A.5th).

Probably the rule to be applied will vary with the circumstances in each case. If Rose, the tug's captain, had ordered the maneuver, he would have assumed responsibility for it, and would have rested under the duty of repairing his fault, if such it could have been discovered to be, by reasonable effort to reclaim the barge.

Definitely it was not the act of the tug, but of the captain of the barge, who said that he gestured with his axe to indicate his intention of cutting away the hawser, to impress the tug with the extremity in which the barge and her crew were placed.

Seemingly the "feckless folk" doctrine concerning bargees [Cranberry Creek Coal Co. v. Red Star Towing & Transp. Co. (C.C.A.) 33 F.(2d) 272] is somewhat relied upon by libelant. Doubtless the court did not intend to announce that all later cases involving the conduct of one in charge of a sea-going barge should be decided upon the theory that such persons are judicially deemed to be feeble or of no account. Probably they, like the rest of mankind, are entitled to be appraised individually, and in this instance Sheldon gave a good account of himself—afloat and ashore.

The many cases cited by libelant and respondent have been examined and the facts involved are so varied and differ so widely from those now presented, that a discussion would needlessly prolong this opinion.

■ It may be said that The Joseph F. Clinton (C.C.A.) 250 F. 977, is deemed to contain an exposition of the law with respect to the tug's duty under such circumstances; this means that the Rob Roy should not have been abandoned until all reasonable efforts had been made for her preservation. It was therefore requisite to establish that she could have been towed to a place of safety, in her condition as revealed by Sheldon, namely, with 3 feet of water in her, which was gaining, owing to the failure of the pumps.

732

No testimony to that effect is in the record. The barge was about 5 miles offshore and perhaps 11 miles north of Barnegat Light. A return to Sandy Hook was the only possible thing if haven was to be sought. The barge captain refused to return to his vessel, because he believed she would sink during the night, which she did. It was due to his repeated refusals to go back, or put a man on board who could steer, that Rose decided to take the Howard E. again in tow and return with her to Sandy Hook.

His reason for not trying to reassemble the tow, putting the Howard E. in the lead, was that, without a man at the wheel of the Rob Roy, she would veer so as to endanger the whole tow. It may be that this judgment was in error, but there is no testimony to support such a conclusion.

Even if Rose had boarded the Rob Roy himself, or sent some one else, it is not shown that he would have discovered conditions to be other than as Sheldon related them. It is not shown that he could have caused the wheel or the tiller on the barge to have been lashed so as to constitute her a safe element in a towing operation back to Sandy Hook.

Sight has not been lost of the requirement resting upon the tug to establish her own freedom from fault in the circumstances which overtook these vessels. It is deemed that this requirement has been met by the testimony of Rose, corroborated as it is by that of Sheldon, the captain of the Rob Roy.

That testimony has not been overborne, nor indeed challenged, by evidence adduced from other witnesses; it is sought to be disparaged in the arguments of opposing counsel, but without supporting citations to the record.

If the court were to conclude that the tug was at fault, the decision would not rest upon evidence in the case.

Apparently nothing was deemed to have been shown respecting the tug's responsibility for damage to the cargo on the Howard E. save the bare fact that departure was had from New York, under the conditions shown. It is found that there was no fault in that.

The libel is dismissed as well to the tug as to the respondent owner, with costs.

Settle decree, and findings if desired, on notice.