## CUNNINGHAM v. CITY OF NEW YORK et al.
## THE CONFIDENCE.
## No. 17568.

United States District Court
E. D. New York.

July 13, 1950.

Frank G. Colgan, of Brooklyn, N. Y., for libellant.

John P. McGrath, New York City, Corporation Counsel, City of New York (Joseph T. Caponigri, New York City, of counsel), for respondent City of New York.

Macklin, Speer, Hanan & McKernan, New York City (Leo F. Hanan, New York City, of counsel), for respondent Colonial Sand & Stone Co., Inc.

BYERS, District Judge.

Libellant's Steamtug Confidence (68′ long by 17′ in beam, with draft of 8′) capsized and sank at the north side of Pier No. 93 North River on May 23, 1944, as the result of the lower guard rail on her starboard side being caught on a broken pile of the Pier which was about 150 or 200 feet outboard from the bulkhead. She had been moved from her previous berth which was close to the bulkhead, by the respondent Colonial Sand & Stone Co., Inc., on May 19, 1944, to facilitate the latter's handling of the loaded cement scow Mary Brigham (drawing 9 feet) at about the berth originally occupied by the tug.

The latter had been berthed in the first position for over five months, and was a dead craft on this day.

Colonial according to the pleadings "owned, operated, leased and was in possession and control of the bulkhead dock" of this Pier, "and used said dock or berth for the receiving of scows and barges and the cargo aboard, and for the discharging and loading of said scows and barges".

The said Pier had fallen into disrepair as to its supporting spiles or piles, as will be seen from the photographs constituting Lib. Ex. 1, which may be not unrelated to the acquisition of title to the Pier by the City from the State of New York on May 19, 1944, four days before this occurrence.

There is no actual conflict in the testimony as I understand it. The tug was shifted by Colonial as stated, to create an open space on the north side of the Pier, at the bulkhead, to accommodate the cement scow, Mary Brigham (about 120′ long by 35′ in beam, drawing about 9 feet) by a movement which has not been described, the tug being hauled astern by hand lines, and made fast to the north side of the Pier some 150 to 200 feet from the bulkhead. She remained in that position without incident until the 23rd at about 3 P.M.

The scow Watson had been placed some 10 to 15 feet astern of the tug on the 21st, where she lay until about 3 P.M. on the 23rd when she was shifted to the bulkhead, broadside to, through the manipulation of a pole to push her away from the Pier, and the handling of a bow line and perhaps a stern line. As to that, the witnesses do not agree.

However, her bargee, Salvesen, told how his scow was warped from astern of the tug, alongside the latter, her stern swinging to starboard when opposite the Brigham, and so as to be landed broadside to the bulkhead as stated. Describing the movement as to the tug he said: "She (his vessel) might have slid up against him * * *." which is probably no overstatement.

It seems reasonable to infer that the lateral force so engendered was sufficient to engage the lower starboard guard rail of the tug, with a broken off spile at the side of the Pier, or to enhance an engagement if it already existed (Salvesen says the tug had a slight list to port at the time his movement started) whereby the tug was upheld on her starboard side in the falling tide, with the result that she capsized. Such is the finding as the evidence is understood.

The tug was in a safe berth for the period stated, and nothing happened to her until she was shifted by Colonial.

As to the responsibility of the latter, the fact that operations were being conducted at this bulkhead for a period of time, charge the company with knowledge that, as Dockmaster Smith states the condition as to the fender system, "some portions of the upper parts (were) either cut off or carried away".

Also, to quote Cooney, Harbor Master, employed by the State: "Near the bulkhead it is a good berth. I wouldn't give a berth down here (indicating on Exhibit 1 the vicinity of the tug's second berth) to any tug. * * *

"Q. And did you use that other berth for any other purpose? A. Well, I did use it when I got some high barges out, high out of the water—it wouldn't do them any damage."

On this day, low water occurred at about 5 P.M. D.T. which was two hours after the Watson was shifted; the fall from high to low water at this slip was 3½ feet.

It seems clear that the capsizing of the tug was the result of her shifting, and that Colonial assumed responsibility for accomplishing that result without damage to the tug, either as the result of the operation itself, or of the shifting of the Watson in contact with the tug while the latter was moored in a position exposing her to damage from the ends of the obviously broken spiles.

It is urged for Colonial that, at least, the City is jointly liable for maintaining this Pier in the faulty condition shown. Since title to the Pier passed on the day of the shifting, there was but a limited period during which the City could have become informed of the defects, and either taken corrective measures, or required the tug to be moved from an unsafe berth. Moreover, the City did not do the

shifting. It should be held to secondary liability, however, since it billed the libellant for his berth space, commencing May 19, 1944, thereby holding itself out as a wharfinger. The doubtful point is whether the charges were billed with reference to the safe berth, or to the new one selected by Colonial.

The libellant is to take the usual interlocutory decree against Colonial primarily, and the City secondarily, with costs.

Settle decree.