**LYNCH v. AGWILINES, Inc., et al.**

No. 18, Docket 21663.

United States Court of Appeals
Second Circuit.

Argued Oct. 5, 1950.

Decided Oct. 31, 1950.

Foley & Martin, New York City, Christopher E. Heckman, New York City, of counsel, for libelant cross-appellant.

Burlingham, Veeder, Clark & Hupper, New York City, Chauncey I. Clark, Frederic Conger, New York City, of counsel, for claimant-respondent-appellee and cross-appellant.

J. Vincent Keogh, United States Attorney, Brooklyn, N. Y., Leo J. Curren, New York City, for appellant.

Haight, Deming, Gardner, Poor & Havens, New York City, Henry M. Hewitt, New York City, of counsel, for claimant-impleaded-appellee.

Before L. HAND, Chief Judge, and SWAN and CLARK, Circuit Judges.

L. HAND, Chief Judge.

These are appeals from a decree in the admiralty awarding half damages to the libelant for injuries to her scow by being crushed in the slip between Piers 36 and 37 on the Manhattan shore of the Hudson River. We ignore the orginal libel which was filed on April 10th, 1944, and start with an amended libel which was filed by permission on April 15th, 1946. This was against the tug, Atwood, *in rem* and against the respondent, Agwilines, Inc., *in personam* (by foreign attachment); and alleged that the tug had made the scow fast alongside a derrick lighter, The Comrade, which in turn was made fast alongside the U. S. S. Abiqua, which was moored to the south side of Pier 37. These three vessels—the ship, the derrick and the scow—occupied the whole width of the slip except three or four feet between the south side of the scow and the north side of Pier 36. The tug, having made fast the scow to the derrick, went about her business, and when she came back to the slip, about half an hour later, she found that the ship had sagged away from Pier 37, and squeezed the scow between the derrick and Pier 36, causing the injuries complained of. The answer of the claimant-respondent, Agwilines, impleaded the United States and the derrick as parties at fault, and at the trial on December 18th, 1948, it moved to amend its petition by asserting a claim against the United States under a "Berthing Agreement" between itself and the War Shipping Administration, which engaged to indemnify it for any liability to third persons incurred by Agwilines during performance of the agreement. The judge decided that Agwilines was liable for failing to advise the ship of the narrow margin left between the scow and Pier 36, but that the bargee was also responsible for inattention to his scow as the margin closed. He held Agwilines liable for half damages, the United States liable to Agwilines as indemnitor, and he exonerated the derrick. The United States, the libellant and Agwilines have appealed.

The first question is one of fact: what caused the ship to sag away from Pier 37? The testimony was that her lines to the pier did not render; and, if not, it is hard to find any other explanation than in the fall of the tide during the half hour between five and five-thirty that afternoon. Since the difference between high and low water at that place is only about four feet, the drop in thirty minutes could not have been more than eight inches, which seems a scant allowance for a horizontal movement of the ship of between three and four feet. Nevertheless, if the ship's lines to the pier were long, and if, when they were put out, the deck of the ship was high above the pier—so that they ran near to perpendicular—it is not impossible that she might have moved off as much as the witnesses assumed. The judge considered all these circumstances in detail—regretting that it did not appear at what stage of the tide the ship was moored—and finally concluded that the cause of the sagging was

the fall of the tide; and we can see no ground for differing with his finding. The only persons, who can be charged with notice of the approach of the scow to the pier, are the bargee, the tug master, the Agwilines' harbor master and the ship. We need not consider the ship because when the United States was impleaded, it was already too late to bring suit; nor were those on board the derrick charged with any duty to the scow.

First, as to the harbor master. If it had appeared that he remained at Pier 36 or nearby after the tug had made the scow fast and had left, it could with some plausibility be argued that he should have exercised some supervision over the scow and intervened before any contact occurred, or immediately thereafter. On the other hand, if he went away in the tug, no liability can be imposed upon him beyond that imposed upon the tug master. The evidence will not support a finding that he was on or near Pier 36 after the tug left. Early that morning the tug had placed the scow near the bulkhead on the north side of Pier 36; and had made fast another scow, the No. 122, alongside the derrick. That filled up the slip, so that, when the No. 122 had been discharged, in order to replace her by the libellant's scow the tug had first to push the No. 122 up to her, run a line between the two, and pull both out tandem until the libellant's scow was abreast of the derrick. The harbor master took part in this maneuver and was for a time on board the libellant's scow because it was he who fastened her to the derrick. However, the libellant's bargee testified that the harbor master went away on the tug, and there was other testimony, including his own, which seems to imply that he did, although he was not directly asked the question. The judge made no finding; and since the libellant had the burden of proving that the harbor master remained in the vicinity so far as that was a factor in measuring his liability, we must dispose of the issue on the assumption that he was not present after the tug left. If so, any liability of Agwilines depends upon whether at that time the harbor master and the tug master should have foreseen the possibility that the ship might sag off as she did, and that the bargee would not notice it in time and provide against it.

 The judge found that the tug master should have so foreseen and have so provided, although he did so "with hesitation," thinking that the liability could "be supported only by a slender margin of reasoning, if at all." Since this finding set the standard of care proper in the circumstances, it was not a finding of fact, and we must form an independent judgment on it as though it came before us in the first instance.[1] Had the scow been without a bargee, we need not say that the standard was too severe: i. e., that the tug master ought not to have told someone on the ship that the scow was only three or four feet away from the pier. At any rate arguendo we shall so assume. However, there was a bargee on board and he was on deck, for he swore that he had protested against being pushed in and that while the derrick was discharging the scow's cargo—aeroplanes and boxes—aboard the ship, he was "moving around the planes to see what is going on." Since he was there and was apparently alert to his duties, was it proper for the tug master to assume that he would observe the scow's slow but steady approach to the pier? It is true that a speed of one inch, or even an inch and a half, a minute was too little to be observed as movement; but the decrease in the distance over a period of thirty minutes was not too little. Even the most casual glance from the deck of the scow would have shown the bargee how far away the scow was when she was put in position, and a second glance at any time during the last ten minutes of the half hour would have disclosed the danger. Besides, it must be remembered that the scow was tightly pinioned between the derrick and the pier, and that must have required an appreciable in-

1. The C. W. Patterson, 2 Cir., 70 F.2d 712; Ford Motor Co. v. Manhattan Lighterage Corp., 2 Cir., 97 F.2d 577; Barbarino v. Stanhope S. S. Co., 2 Cir., 151 F.2d 553; Kreste v. United States, 2 Cir., 158 F.2d 575.

terval after the first contact. Surely the bargee should have known when the scow actually began to strike the pier as she listed back and forth during her discharge.

It appears to us too severe a standard to charge the tug master with anticipating that the bargee might be so delinquent. Had the mishap been one which, if it came, was sure to be sudden, it might have been unreasonable to expect any one of such limited capacities as a bargee to provide against it; but, being as it was a gradually manifested danger which could have been averted until almost the last moment by throwing off the lines and pushing out the scow, why should not the tug master have assumed that it would be fended off? We share the judge's "hesitation," his doubt as to the "slender margin of reasoning" which can support liability; but we go further—we think that there was not even a slender margin. The libellant answers that under our decisions a bargee is not responsible for failing to examine an apparently safe berth to which his vessel has been consigned;[2] and that therefore, if the tug master did rely upon him in this instance, he may not exculpate himself against the libellant. It is true that a bargee's duties cannot be precisely defined, but it is a mistake to suppose that they are limited to pumping, to tending lines and to looking out for the inside of his barge In Dailey v. Carroll[3] we declared that they

include not only "the care or internal economy of the vessel", but "cleaning, pumping, mooring, and watching * * * and watching a vessel includes watching her lines"; and we have repeatedly held carriers liable for their neglect seasonably to shift their barges out of danger.[4]

Decree reversed; libel dismissed.

2. The Eastchester, 2 Cir., 20 F.2d 357; N. Y. Trap Rock Corp. v. The Metropolitan, 2 Cir., 128 F.2d 831, 832.

3. 2 Cir., 248 F. 466, 468.

4. Clyde Lighterage Co. v. Pennsylvania R. R. Co., 2 Cir., 258 F. 116; The Teno (The

Tamarack), 2 Cir., 47 F.2d 197; The Castleton, 2 Cir., 64 F.2d 11; The Trenton, 2 Cir., 72 F.2d 283; Fulton Lighterage Co. v. New York & Cuba M. S. S. Co., 2 Cir., 83 F.2d 244; Tucker v. Reading Co., 2 Cir., 127 F.2d 527.