The **HUTTON COMPANY**, as owner of the SCOW R. ENGELBRECHT, Libellant,

v.

**ARROW BUILDERS SUPPLY CORPO·RATION**, Respondent,

**TUG CHIPPEWA II**, Nassau Towing Corporation, Claimant,

and

**TUG VALMORAC**, Valmorac Tugboat Corp., Claimant-Respondent.

No. 62 Ad. 800.

United States District Court S. D. New York.

June 28, 1966.

Foley & Martin, New York City, for claimant Nassau Towing Corp. and Tug Chippewa II; John H. Hanrahan, New York City, of counsel.

Foley & Grainger, New York City, for claimant-respondent Valmorac Tugboat Corp. and Tug Valmorac; Joseph Grainger, New York City, of counsel.

Macklin, Hanan & McKernan, New York City, for libellant; John C. Hart, New York City, of counsel.

E. Edan Spencer, New York City, for respondent Arrow Builders Supply Corp.; Maley M. Cohen, New York City, of counsel.

## OPINION

McLEAN, District Judge.

This is a suit in admiralty which arises out of a collision between a scow and a barge in the Harlem River on January 22, 1962. The barge was being pushed by two tugs, the Chippewa II and the Valmorac. Libellant, owner of the scow, sues the two tugs and their respective owners and also sues Arrow Builders Supply Corporation ("Arrow") at whose dock the scow was moored prior to the collision. Arrow has cross claimed against the tugs and their owners. The tug Valmorac and its owner has cross claimed against the Chippewa II and its owners.

The libel contains a wholly unrelated second count setting forth a claim by libellant against Arrow for the price of bricks sold and delivered by libellant to Arrow.

I find the facts to be as follows.

At the scene of the accident, the Harlem River runs approximately north and south. It is crossed by the 207th Street Bridge, which rests upon a long abutment that runs lengthwise in the center of the river and projects beyond the bridge, thereby dividing the river into two "draws" or channels. The distance from the southerly tip of the abutment to the east bank of the river is approximately 150 feet. Arrow's dock is on the east bank of the river at this point, south of the bridge. The dock lies opposite the center abutment.

On January 22, 1962, two scows were moored to Arrow's dock, parallel with it, with their starboard sides against the dock. The William Hutton was to the north, nearest the bridge. Immediately south of her lay the R. Engelbrecht, the scow involved in this collision. She was a "dumb scow," i.e., she had no motive power of her own.

The Engelbrecht had arrived at the dock from Kingston, New York, on December 8, 1961, laden with a cargo of brick consigned by libellant to Arrow. Between December 11, 1961 and January 19, 1962, part of her cargo was discharged to the dock, and delivered to Arrow. The balance of her cargo was still on board.

On January 22, at approximately 10:15 A.M., the lines which held the bow of the Engelbrecht to the dock were cast off, and her midship line as well. This left her tied to the dock only by two stern lines. The bow of the Engelbrecht swung out into the river, partially blocking the channel between the east bank and the bridge abutment in the center of the river.

At just about this moment, a flotilla consisting of the laden oil barge Dana Bray and the Chippewa II and the Valmorac came along, going north. The two tugs were pushing the Dana Bray. The Chippewa II was tied to the starboard side of the barge, approximately 150 feet back or south from the barge's bow. The Valmorac was dead astern of the barge.

The starboard edge of the bow of the Dana Bray struck the port side of the Engelbrecht at a point at least 15 feet aft of her bow, and stove a hole in her. The Engelbrecht sank. After she settled to the bottom, a good part of her superstructure and part of her cargo of brick still protruded above the water.

As between libellant and Arrow, the question is whether it was Arrow that placed the scow in this position of danger, and if so, whether Arrow acted negligently in so doing. As between libellant and the tugs, the question is whether the tugs were at fault in failing to avoid the collision.

In my opinion, libellant has the better of the controversy with Arrow. The Engelbrecht was moved by Arrow's employees upon the instructions of Arrow's yard superintendent. The lines were cast off by Arrow employees. The scow was pushed out into the river by a shove from a "clam bucket," a type of crane operated by Arrow employees. The scow was under Arrow's control throughout this movement.

The purpose of the movement was to serve the convenience of Arrow in the discharge of the scow's cargo, a work

which was performed by Arrow's employees. The plan was to place the Engelbrecht alongside of and outside of the scow William Hutton, so that the portion of the Engelbrecht's cargo not already discharged would be more accessible to the clam bucket which Arrow used to hoist the bricks from the scow to the dock. Arrow's superintendent believed that the current in the river was running to the north at the time. He believed that when the bow of the Engelbrecht was pushed out, the current would carry the scow northward parallel to the William Hutton, to which it could then be made fast.

The plan went awry because the superintendent was mistaken as to the direction of the current. In fact, it was flowing to the south. The evidence conclusively establishes this fact. Consequently, when the bow of the Engelbrecht was pushed out, it swung to the south out into the channel.

I find that Arrow caused the scow to be moved in this fashion. I find and conclude that in so moving it, under the conditions then prevailing, Arrow was negligent, and that its negligence was a proximate cause of the accident and of the damage to the scow. Cunningham v. City of New York, 91 F.Supp. 460 (E.D.N.Y. 1950).

I also find that the bargee, an employee of libellant, was aware of the plan to move the barge and the manner of its moving, and that he acquiesced in it. He, too, was under the mistaken impression that the current was flowing north. The question, therefore, arises as to whether this fact relieves Arrow of responsibility for its negligent handling of the scow. In my opinion, it does not. The Court of Appeals has said, apropos of bargees, that "the so-called 'captains' of such craft are no more than laborers or deckhands, who cannot reasonably be looked upon as are shipmasters exercising a real command * * *." Dailey v. Carroll, 248 F. 466, 467 (2d Cir. 1917).

See also Cranberry Creek Coal Co. v. Red Star Towing & Transp. Co., 33 F.2d 272, 275 (2d Cir. 1929), cert. denied sub nom. New York Marine Co. v. Cranberry Creek Coal Co., 280 U.S. 596, 50 S.Ct. 67, 74 L.Ed. 643 (1929); In re Eastern Transp. Co., 37 F.2d 355, 363 (D.Md 1929), aff'd with modification on another ground sub nom. The Calvert, 51 F.2d 494 (4th Cir. 1931).

It would seem to follow that a bargee has no power to bind his employer by his consent to the assumption of control over the scow by a third party, or by his acquiescence in conduct of the third party which results in damage to the scow. If the bargee had assumed command of this operation, and had himself mishandled the scow, a different question would be presented. That is not what occurred here.

I turn now to the claim of libellant against the tugs. The evidence on this subject is somewhat conflicting. The witnesses were inarticulate and their testimony in some respects was not as lucid as one could wish. Nevertheless, from the evidence as a whole, a reasonably clear picture emerges as to what occurred. I find the facts in this respect to be as follows.

The flotilla, consisting of the oil barge Dana Bray and the two tugs, proceeded northbound in the Harlem River, at full speed, i.e., approximately seven miles per hour, until it reached a point about opposite 201st Street. Its speed was then cut in half, to approximately 3½ miles per hour, as it approached the east draw or channel. It was necessary for the flotilla to go north through the east channel because another tug and its tow was proceeding south through the west channel at the time. The tugboat captains could see the Engelbrecht ahead of them, lying at an angle to the dock. When they first saw her, her bow was not as yet far out into the river. If the scow had remained in that position, there would have been sufficient, although not ample, room for the flotilla to pass between the Engelbrecht and the center abutment of the bridge. However, the

Engelbrecht continued to move. When the bow of the Dana Bray was some 35 to 50 feet away, the Engelbrecht's bow moved out to almost a right angle from the dock. The Engelbrecht was 117 feet long. The Dana Bray was approximately 40 feet wide, and the tug Chippewa II was approximately 19 feet wide. Hence there was no longer room for the flotilla to pass between the scow and the bridge abutment. The tugs reversed their engines but could not stop in time to prevent the collision. At the time of impact, the port bow of the Dana Bray was only some four feet away from the bridge abutment.

■ The question boils down to whether the captain of the Chippewa II, who was in command of the flotilla, was negligent in continuing to approach this narrow passage at half speed after he observed that the Engelbrecht was not lying parallel to the dock on the east bank. With the aid of hindsight, one may criticize his judgment. But viewing the situation, as one must, as it existed before the collision, I have concluded, after careful consideration, that the tugboat captain could not reasonably have anticipated that the Engelbrecht would be so wholly uncontrolled and left by those in charge of her so utterly at the mercy of the current that she would be permitted to swing out farther almost broadside to the channel. I find and conclude, therefore, that the tugs were not at fault, and that the negligence of Arrow in bringing about this situation was the sole proximate cause of the accident and of the damage to the Engelbrecht.

The libel is dismissed as against the tugs Chippewa II and Valmorac and their owners. Arrow's cross claim against the tugs and their owners is also dismissed. The cross claim of the Valmorac against the Chippewa II, under these circumstances, becomes academic. The issue of damages as between libellant and Arrow will be referred to a commissioner.

As to the second count in the libel, the parties have stipulated that Arrow agreed to buy and pay for bricks delivered to it by libellant prior to January 22, 1962. I find that up to that date a total of 541 packages and 17 "units" of brick were delivered. The issue of damages with respect to this amount will also be referred to the commissioner.

Pursuant to Admiralty Rule 46½, this opinion constitutes the court's findings of fact and conclusions of law.

Settle decree on notice.